Nayeem Mehtab **CHOWDHURY**, World-Tel Bangladesh Ltd. and World Communications Investment Incorporated, Plaintiffs,

v.

**WORLDTEL BANGLADESH HOLDING, LTD.** and Amjad Hossain Khan, Defendants.

No. 08 Civ. 1659(BMC).

United States District Court, E.D. New York.

Dec. 5, 2008.

Mark Allen Robertson, Fulbright & Jaworski LLP, for Plaintiffs.

J. Eric Charlton, Hiscock & Barclay, LLP, for Defendants.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

This is an action alleging violations under the Aliens Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), and the Torture Victim Protection Act, 28 U.S.C. § 1350 note 2(a)(1) ("TVPA"). The individual plaintiff and his corporate employer, and its corporate shareholder, allege that the defendants, to gain an advantage in a business dispute between the parties, made a false complaint of criminal conduct by plaintiffs to the Bangladeshi police. As a result of this criminal complaint, the individual plaintiff was arrested and tortured.

The case is before the Court on defendants' motion to dismiss for failure to state a claim.

## SUMMARY OF COMPLAINT

Plaintiff Chowdhury is a Bangladeshi citizen and legal resident of the United States. He is the managing director of plaintiff WorldTel Bangladesh Ltd. ("WorldTel Ltd"), a Bangladeshi corporation, and a stockholder and officer of plaintiff World Communications Investments Incorporated ("WCII"), a B.V.I. corporation, which owns the stock of WorldTel Ltd.

WorldTel Ltd was created to provide landline telephone service to the Dhaka area of Bangladesh. Shortly after it was constituted, WCII and defendant WorldTel Bangladesh Holding ("Holding"), a Mauritius corporation, became shareholders. The individual defendant Khan is a U.S. citizen with a role in Holding that he has variously described as chairman of the board, owner, or representative.

As part of the settlement of a dispute in 2006, WCII bought out Holding's stock interest in WorldTel Ltd. The dispute had included defendants' filing of criminal charges against Chowdhury alleging bank fraud and forgery. Two separate governmental investigations concluded that these charges were without merit. The settlement and buy-out occurred after dismissal of the charges.

Notwithstanding the settlement, in 2007, Khan, acting on behalf of defendants, again filed criminal charges against Chowdhury and WCII making the same allegations of bank fraud. This time, Chowdhury was arrested and imprisoned for approximately five months. Khan and Holding participated in at least one bail hearing, and Chowdhury was repeatedly denied bail. The complaint alleges that during his first week in custody, Mr. Chowdhury was subject to electric shock including electric shock that was applied to Mr. Chowdhury while Mr. Khan was in the [police] facility where Mr. Chowdhury was being held and tortured. In addition to the shocks, Mr. Chowdhury was subjected to being handcuffed to a cell door for hours at a time in a manner that required him to stand.

The complaint further alleges that during Chowdhury's period of incarceration, Khan offered to withdraw the criminal complaint and "permit Mr. Chowdhury to be released from jail" if Holding was given control of WorldTel.

## DISCUSSION

### I. Standard of Review on a Motion to Dismiss

■ For purposes of a motion to dismiss under Rule 12(b)(6), the Court accepts as true plaintiffs' allegations, and draws all plausible inferences in plaintiffs' favor. *See City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 392 (2d Cir.2008). In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007), the Supreme Court held that for a complaint to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 1965 (citation omitted), and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. If plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.*

Defendants argue that claims under the ATCA are subject to a higher pleading

standard than normally applicable under Fed.R.Civ.P. 8(a), citing *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995). There, the Second Circuit held:

> Because the Alien Tort Act requires that plaintiffs plead a "violation of the law of nations" at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible "arising under" formula of section 1331. Thus, it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States).

*Id.* at 238 (citation omitted).[1] However, to say that an ATCA claim must be pled with more than "mere colorability" does not necessarily mean there is a "heightened" pleading requirement. *Kadic* was decided long before the Supreme Court's decision in *Bell Atlantic,* in which the Supreme Court rejected the venerable language from *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," in favor of the "plausibility" standard referred to above. The Second Circuit has not interpreted *Bell Atlantic* as creating a "universal standard of heightened fact pleading," but instead has concluded that the plausibility standard "obliges a pleader to amplify his claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original).

■ Regarding ATCA claims as one of the "contexts" referred to in *Iqbal* where some additional factual amplification will often be necessary to render the claim "plausible" rather than merely "colorable" or "conceivable" fits comfortably into the pleading standard set forth in *Kadic.* Additional amplification is often required in this context because the statute is based upon a "violation of the law of nations," 28 U.S.C. § 1350, an imprecisely-defined concept which lends itself, as this case shows, to some disagreement. This does not mean that the pleading requirement for such claims has been "heightened," because like all claims, ATCA claims are held to nothing more than the plausibility standard. All it means is that a plaintiff must include enough factual allegations to enable a court to determine whether, if true,

---

1. Although defendants rely on *Kadic,* neither they nor plaintiffs comment on the fact that *Kadic* presented a challenge to subject matter jurisdiction, which defendants have not raised here, rather than an alleged failure to state a claim. The parties have thereby skirted the very substantial issue, one that has recently divided a panel of the Second Circuit, as to whether there are separate tests for analyzing subject matter jurisdiction and failure to state a claim under the ATCA. *See Khulumani v. Barclay National Bank Ltd.,* 504 F.3d 254 (2d Cir.2007) (per curiam) (concurring opinions of Judges Katzman and Hall state that the issues need to be separately analyzed, while the opinion concurring in part and dissenting in part of Judge Korman views the inquiry as presenting a single issue). Because the parties here treat the issue of failure to state a claim as indistinguishable from the issue of subject matter jurisdiction, I will as well. In addition, I agree with Judge Korman's view that under the peculiar wording of this statute—it does not, unlike the usual jurisdictional statute, apply to cases "arising in or arising under" the subject matter, here, international tort law, but rather grants jurisdiction "for a tort only, committed in violation of the law of nations ...", 28 U.S.C. § 1350—Congress did not intend two separate analyses to determine subject matter jurisdiction and failure to state a claim.

those facts plausibly, rather than merely conceivably, constitute a violation of the law of nations. This Court will therefore evaluate the present complaint under that standard.

## II. ATCA Claims

Plaintiffs allege two claims for relief under the ATCA arising out of the facts described above: first, defendants violated the law of nations and the ATCA directly by their actions; second, that they aided and abetted the Bangladeshi authorities in violating the law of nations. Defendants' attack on these claims divides into two grounds: (1) whether the abusive conduct complained of, regardless of who committed it, rises to a level that makes it actionable under the ATCA; and (2) if it does, what parties are liable for that conduct, and to who.

### A. The Acts

Defendants initially assert that the acts of which plaintiffs complain—the use of electric shock upon a prisoner, forcing a prisoner to stand for hours at a time while handcuffed to a cell door, and arbitrary detention and denial of pretrial bail—are not actionable under the law of nations and thus under the ATCA.

The Supreme Court's decision in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), controls this issue. There, the Court instructed lower courts to exercise "great caution" before finding that any particular set of facts violates the law of nations. *Id.* at 728, 124 S.Ct. at 2764. Although the Court rejected the view of Justice Scalia, concurring in the judgment, that the courts have no role at all in interpreting the law of nations beyond its state at the enactment of the ATCA in 1789, the Court's decision may have resulted in only a theoretical rather than a practical distinction between its position and that advanced by Justice Scalia. Indeed, the Court could hardly have been more circumscribed in setting forth the standard by which a violation of the current state of the law of nations could be found. Its decision is replete with alerts to the dangers of judge-made law in this area, requiring courts to use "vigilant doorkeeping," *id.* at 730, 124 S.Ct. at 2764, restraint in exercising their discretion, and firm international law recognition of the right being asserted. It found that at the time of the statute's enactment, there were only three firmly recognized torts that fell within the statute, exemplified by piracy and offenses against ambassadors, and, meeting Justice Scalia half-way, it held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and *defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." Id.* at 725, 124 S.Ct. at 2761–62 (emphasis added). Based on that standard, it required dismissal of the plaintiff's ATCA claim that he was illegally arrested and held for one day before being lawfully turned over to authorities.

Plaintiffs have provided scant authority to support their claim that the law of nations encompasses the mistreatment of which they complain. There is no citation to any treaty, compact, foreign law, article, or compendia that would validate their claims. This is surprising, because *Sosa* was quite clear as to where lower courts should look to determine the existence of a claimed international norm:

> [W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experi-

ence, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Sosa,* 542 U.S. at 734, 124 S.Ct. at 2766–67 (*quoting The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)). The Court in *Sosa* identified two sources by which an international law norm could be identified: positive law, *e.g.,* a widely subscribed treaty having binding effect on its signatories, or customary international law, *i.e.,* the observance of a principle so widely adhered to amongst the law of nations that it has become the functional equivalent of positive international law.

The plaintiff in *Sosa* offered various indicia as to the state of international law on the point he was asserting—arbitrary detention in excess of local authority—but the Court found them all inadequate. It rejected the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948), and the International Covenant on Civil and Political Rights (Covenant), Dec. 16, 1966, 999 U.N.T.S. 171, because although those documents prohibited arbitrary detention, the former was merely declarative, not enforceable, and the latter was similarly not self-executing and required enabling domestic legislation. The Supreme Court similarly rejected a law review article surveying prohibitions against arbitrary detention under various national constitutions, *see* Bassiouni, *Human Rights in the Context of Criminal Justice: Identifying International Procedural Protections and Equivalent Protections in National Constitutions,* 3 Duke J. Comp. & Int'l L. 235, 260–61 (1993), on the ground that the "consensus" it showed "was at a high level

of generality." *Sosa,* 542 U.S. at 737 n. 27, 124 S.Ct. at 2768 n. 27. Finally, the Court rejected lower federal court decisions on which the plaintiff relied because those cases reflected "a more assertive view of federal judicial discretion over claims based on customary international law than the position we take today." *Id.*

Notwithstanding *Sosa's* restriction of the ATCA to a "narrow class of international norms," *id.* at 730, 124 S.Ct. at 2764, the Court expressly approved of the Second Circuit's decision in *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), and its progeny, holding that *Filartiga* had properly found a modern international norm, the violation of which would form a basis for an ATCA claim. This is important for the instant case because *Filartiga* was a torture case. *Filartiga* held, and indeed the *Sosa* court quoted the holding approvingly, that "for purposes of civil liability, the torturer has become—like the pirate and slave trader before him—the enemy of all mankind." *Sosa,* 542 U.S. at 732, 124 S.Ct. at 2766 (*quoting Filartiga,* 630 F.2d at 890).

■■■ Despite the absence of *Sosa*-quality authority offered to support plaintiff's argument, I have no hesitation in holding that the use of gratuitous, punitive, or coercive electric shock against a pretrial detainee constitutes torture. The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual

or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1350 (statutory note § 3(b)(1)). This seems to squarely include the use of electric shock as plaintiffs have alleged. The U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment, *opened for signature* Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (1984), *as modified* 24 I.L.M. 535 (1985), *entered into force* June 26, 1987, *ratified by United States* Oct. 21, 1994, 34 I.L.M. 590, 591 (1995), which the United States has ratified although it has not passed enabling legislation, defines torture similarly. In presenting that Convention to Congress, the State Department noted that

> rough treatment as generally falls into the category of "police brutality," while deplorable, does not amount to "torture." The term "torture," in United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, *application of electric currents to sensitive parts of the body,* and tying up or hanging in positions that cause extreme pain.

President's Message to Congress Transmitting the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Summary and Analysis of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, May 23, 1988, S. Treaty Doc. No. 100–20, *reprinted in* 13857 U.S. Cong. Serial Set at 3 (1990) (emphasis added) (*citing* European Court of Human Rights, Judg. Court, January 18, 1978, *Ireland v. United Kingdom Series A,* No. 25, 2 E.H.R.R. 25, 80; European Commission of Human Rights, Op.

Com., 5 November 1969, *Greek Case,* § 11, YB XII p. 501). *See also* Mark R. Amstutz, *International Ethics: Concepts, Theories and Cases in Global Politics* 163 (Rowman & Littlefield 2005) ("there is broad consensus among democratic societies that such violence as … use of electrical shock … is morally reprehensible and prohibited by international law"); State of the Union Address 2003 ("International human rights groups have catalogued other methods used in the torture chambers of Iraq: *electric shock,* burning with hot irons, dripping acid on the skin, mutilation with electric drills, cutting out tongues, and rape"), *reported at* http://www.c-span.org/executive/transcript.asp?cat=current_event & code=bush_admin&year=2003 (emphasis added). I therefore conclude that the application of electric shock to a docile pretrial detainee for the purpose of gratuitously inflicting pain or inducing surrender of the will, which I think is the only plausible reading of plaintiffs' allegations, constitutes torture and violates the law of nations.

However, plaintiffs have failed to establish that their remaining allegations—forced standing and arbitrary detention for five months without bail—constitute violations of similarly definite international norms. Plaintiffs recognize that these acts do not fall under the accepted definition of torture, but instead argue that they are within the broader category of "cruel, inhuman and degrading treatment" that also is prohibited by international law.

At the outset, I am not convinced that the framework of cruel, inhuman and degrading treatment remains viable after *Sosa.* Unlike torture, which has widespread statutory and treaty definition, all of which basically converge, the concept of cruel, inhuman and degrading treatment, although regularly used in international compacts, does not have a consensus defi-

nition. It thus suffers from the very danger of a "high level of generality" referred to in *Sosa*. This danger is that individual judges might regard some conduct as something that "should be" considered a violation of a norm of international law rather than conduct that is, which would allow the narrow scope of recognized torts under *Sosa* to expand an inch at time based on the predilection of the individual judge. The better test is that set forth in *Sosa*, namely, whether the acts complained of, even if not torture, are sufficiently heinous under well established authority so that they clearly fall within the handful of prohibited types of conduct.

■ Starting with the allegation of forced standing while handcuffed, it is noteworthy how conclusorily plaintiffs make the allegation—"being handcuffed to a cell door for hours at a time in a manner that required him to stand." There is no allegation that the position caused "extreme pain," as that term appears in the TVPA when referring to a physical restraint. In addition, standing while restrained is of course quite different than being subjected to electric shock because, among other reasons, there is a temporal element to the former. An electric shock against a pre-trial detainee for gratuitous purposes violates the law of nations no matter how long it lasts, carrying both physical and psychological aspects of terror. In contrast, many prisoners are handcuffed at various times; many stand at various times; and many no doubt stand while handcuffed. Neither in their allegations nor in their attempt to support those allegations have plaintiffs pointed me to a method whereby I can qualitatively differentiate between what is permissible restraint of a prisoner as opposed to impermissible restraint, nor why the restraint at issue here crosses over the line sufficiently

so that it is a violation of an international norm.

■ Plaintiffs have the same problem with their allegations concerning arbitrary detention. They start by noting the narrow holding of *Sosa:* "It is enough to hold that a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." 542 U.S. at 738, 124 S.Ct. at 2769. From this, plaintiffs conclude conversely that five months of illegal detention constitutes cruel, inhuman, and degrading treatment, and thereby violates a norm of international law. That conclusion, however, is faulty for several reasons.

First, plaintiffs' argument suffers from the same deficiency as that of the plaintiff in *Sosa*—there is insufficient authority to support it. Indeed, plaintiff does not even cite to the same treaties that the plaintiff in *Sosa* cited, and which the Supreme Court found inadequate to constitute an international norm against arbitrary detention. Plaintiffs instead rely, in part, on pre-*Sosa* authority which the Supreme Court generally rejected as reflecting "a more assertive view of federal judicial discretion over claims based on customary international law than the position we take today." *Id.* at 737 n. 27, 124 S.Ct. at 2768 n. 27.

I cannot find that five months' arbitrary detention falls into that narrow category of crimes where the jailer has become "the enemy of all mankind," *Filartiga,* 630 F.2d at 890, simply because I might think that it should. *Sosa* requires a clear demonstration of a commonly held custom or at least aspiration in the civilized world prohibiting the challenged conduct. Although there is likely some outrageous amount of arbitrary detention from which the conclusion

of a violation of an international law norm would be compelled,[2] plaintiffs, like the plaintiff in *Sosa*, have offered nothing upon which I could that five months' detention, improper as I may consider it to be, rises to that level, any more than the Supreme Court could find that one day of arbitrary detention rises to that level.

In addition, the Supreme Court in *Sosa* cited with approval the Restatement (Third) of Foreign Relations Law of the United States (1986) as assisting, although not ending, the search for an international law norm. The Restatement opines that "a state violates international law if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention." *Id.* § 702. The Supreme Court noted:

> Even the Restatement's limits are only the beginning of the enquiry, because although it is easy to say that some policies of prolonged arbitrary detentions are so bad that those who enforce them become enemies of the human race, it may be harder to say which policies cross that line with the certainty afforded by Blackstone's three common law offenses [i.e., violation of safe conducts, infringement of the rights of ambassadors, and piracy].

*Sosa*, 542 U.S. at 737, 124 S.Ct. at 2769. Here, plaintiffs' arbitrary detention claims suffer not only, as explained above, from a lack of definition as to when the line has been crossed with the certainty required for the torts listed by Blackstone, but there is no allegation of any "policy" or practice at all, which the Court noted is a threshold prerequisite for a norm of international law. *Compare Doe v. Qi*, 349

F.Supp.2d 1258 (N.D.Cal.2004) (finding arbitrary detention actionable under ATCA where Chinese government had a policy of detaining practitioners of *Falun Gong*).

Indeed, plaintiffs' theory of the case seems inconsistent with any "policy." Reading plaintiffs' complaint in the light most favorable to them, plaintiffs had a business opportunity that defendants wanted to steal, and defendants, by some unspecified means, were able to enlist Bangladeshi police authorities to abuse Chowdhury towards that end. This is most plausibly read as a one-off opportunity utilizing police corruptibility and a penchant for abuse, not a "policy." If, instead, the "policy" that plaintiffs are attempting to get at here is that Bangladeshi police are for sale to promote private interests through abuse, which may not even be viable as violating a "norm" of international law, it is not alleged in the complaint.

Finally, I am mindful of the Supreme Court's admonition in *Sosa* that courts must consider the real-world results of finding that a particular set of facts violates an existing but newly-discovered international law norm, noting that "the implications" of the plaintiff's claim in *Sosa* "would be breathtaking." 542 U.S. at 736, 124 S.Ct. at 2768. The Court recognized that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732, 124 S.Ct. at 2766.

That concern is readily apparent here because plaintiffs' allegations concerning

---

**2.** One such example would be the Myanmar government's refusal to release Aung San Suu Kyi from house arrest for nearly six years, despite repeated United Nations' demands and resolutions calling for her release. *See* U.N. News Center, *Myanmar: top UN officials call for release of Daw Aung San Suu Kyi* (May 28, 2008), *at* http://www.un.org/apps/news/story.asp?NewsID=26819 & Cr=myanmar & Cr1=.

the legal procedure applied to Chowdhury's arbitrary detention, standing alone, are not that different procedurally from the constitutional considerations that would be applicable in a domestic case. An individual filed a criminal complaint which on its face at least approached probable cause. An arrest was made based on the complaint. Although plaintiffs complain that Chowdhury was denied bail, they acknowledge that he had "repeated" bail hearings before a judge or judges whom plaintiff does not allege were part of the conspiracy. Chowdhury was then released when he was cleared of all charges, albeit five months later. Even if these actions were not in compliance with U.S. law, there is no showing that they violated international law.

Of course, the compliance with arguably proper procedure does not necessarily mean that there was an absence of a firmly recognized international tort. Domestic court dockets contain hundreds of civil rights cases arising from police misconduct where procedural protections, observed on their face, may be proved to be merely a cover for the deprivation of rights secured by the Constitution. But when that is the issue before the Court, as it is here, it is quite difficult to find a violation of a norm of international law. To do so would require the Court to examine what is alleged as an isolated incident and draw conclusions as to the motivation of the actors involved, many of whom are not subject to subpoena power or even international process for compulsory testimony, and the existence of a "policy" for which plaintiffs have suggested no contours. It would effectively internationalize false arrest and malicious prosecution claims. Like the Supreme Court in *Sosa*, I am concerned that plaintiffs' arbitrary detention claims

> would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the

jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983, and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that now provide damages remedies for such violations.

*Sosa*, 542 U.S. at 736–37, 124 S.Ct. at 2768. The difficulties inherent in the federal courts assuming this burden weighs against recognizing plaintiffs' claim for arbitrary detention.

## B. The Actors and their Victims

Defendants argue that the wrong parties are before this Court. First, they contend that as private actors, they cannot be liable under the ATCA. Alternatively, they contend that if a private party can be liable, then there is no aiding and abetting liability (which plaintiffs have pled alternatively) under the ATCA. Finally, they contend that even if both of these arguments are rejected, there can be no recovery for the corporate plaintiffs because they were not the ones subject to the ATCA violations.

■ Defendants' first point is easily resolved. Although defendants are correct that *Sosa* expressly reserved on the issue of private party liability under the ATCA as the issue was not before it, 542 U.S. at 732 n. 20, 124 S.Ct. at 2766 n. 20, the historical antecedents noted by the Court answer the question. A pirate can be a private party; an assailant of an ambassador can be a private party; yet both are outlaws under the law of nations and thus subject to liability under the ATCA. There is no reason why a private torturer should be treated any differently. What defendants have done is seize upon the narrow-

ness of the conduct covered by the ATCA, as defined by *Sosa*, and applied that narrow scope to also restrict the parties who may be liable under the statute. But the concepts are distinct. If the claim adequately alleges a violation of an international law norm, despite the narrow scope of that parameter, then the perpetrator, whoever he is, may be liable for it. Pre-*Sosa* authority in the Second Circuit establishing this point, *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 104 (2d Cir. 2000), is not at all inconsistent with *Sosa*.

The more complex question is whether there is enough alleged in this particular complaint to satisfy *Twombly*. Defendants are not accused of administering the torture; the only allegations made against defendants are that Khan: (a) filed a false criminal complaint; (b) "worked with the prosecution to keep Mr. Chowdhury in jail;" and (c) was "at the RAB [police] facility at times when electric shock was applied to Mr. Chowdhury."

I am required to apply the Second Circuit's recent pronouncement that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATCA." *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir.2007) (per curiam). However, the fact that plaintiffs could legally plead such a theory does not mean that they have successfully done so. The conclusory allegations of Khan's conduct permit a wide spectrum of possibilities as to his role in the acts of which plaintiffs complain, some of which might be actionable but some not. For example: (a) Khan may not have known that the Bangladeshi police would even arrest Chowdhury upon Khan's complaint, but Khan made the complaint in the hope that commencement of new criminal proceedings would persuade Chowdhury to yield the business opportunity; (b) Khan knew that Chowdhury would be arrested upon his complaint, but had no idea that Khan would be tortured or subjected to degrading treatment; (c) Khan knew that there was some possibility that Chowdhury would be tortured, but thought it was an outside chance; or (d) Khan bribed the Bangladeshi police to arrest and torture Chowdhury. Any of these possibilities, as well as others, is consistent with plaintiff's vague allegations, but some may be actionable under the ATCA and others not. What this means to me is that plaintiffs "have not nudged their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. at 1964–65 (2007).

With regard to aiding and abetting, this is not just a failure to set down the proper words in the complaint. The question is really who is aiding and abetting whom? Unlike the cases plaintiffs cite that allow an ATCA claim for aiding and abetting liability, plaintiffs ascribe no motive for the actions taken by the Bangladeshi police against Chowdhury. No policy is alleged of torturing businessmen to accomplish some state-sponsored end—indeed no state-sponsored end is alleged at all—unlike the apartheid claim in *Khulumani*, 504 F.3d at 259. Nor is this case like *Bowoto v. Chevron Corp.*, No. C 99–02506, 2006 WL 2455752 (N.D.Cal. Aug. 22, 2006), where Chevron hired the Nigerian military under a contract to provide security, which turned into torture and murder, because both Nigeria and Chevron wanted to exploit Nigeria's oil resources and the plaintiffs in that case were getting in the way; at least, Chevron and the Nigerian government had a common interest in deterring oil industry protests.

■ In contrast, plaintiffs' theory here is fundamentally inconsistent with a claim that defendants "aided and abetted" the Bangladeshi police. According to plaintiffs, it was defendants who wanted to

usurp the business opportunity. If anything, the Bangladeshi police were aiding and abetting defendants in accomplishing that end. However, only where a plaintiff has alleged sufficient facts to support the existence of a state policy can his claims under an aiding and abetting theory of liability survive a motion to dismiss.

For that reason, the only potentially viable ATCA claim here is that defendants enlisted the assistance of the Bangladeshi police to violate international law norms on defendants' behalf. A private party can corruptly enlist state resources to accomplish his own ends, and if the means that the private party uses to make his agent, the state, accomplish that goal is the knowing violation of an international law norm, he should be liable as a principal for the violation. But that makes defendants principals, not aiders and abettors.

■ Finally, there is no viable theory under the ATCA upon which the corporate plaintiffs here can recover. Corporations are not tortured; they are not subject to cruel, inhuman or degrading treatment. The corporate plaintiffs' injuries, if any, are entirely derivative. Just as a corporate shareholder generally cannot recover for injuries sustained by the corporation, *see Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986) ("[D]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.") (citation and internal quotation marks omitted), a corporation's claim for injuries to one of its shareholders or officers is too attenuated to support a claim. Plaintiffs' theory would allow a suit by a corporation against the driver of a car injuring one of its key officers, as a result of which the corporation, deprived of the officer's services, lost some opportunity. There is no domestic law norm that would recognize such a claim, let alone an international law norm.

## III.  TVPA claims

Congress enacted the Torture Victim Protection Act to provide a claim for relief in cases of officially sanctioned torture and extrajudicial killing. It states:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

TVPA § 2. In the instant case, the disposition of the ATCA claims set forth above resolves most of the points defendants have raised concerning the TVPA claims.

First, the allegation of electric shock is sufficient to be actionable under TVPA. I see no need for plaintiffs to tack on additional adjectives to dress up the impact of such tactics on a prisoner. Use of electric shock on a pretrial detainee for coercive purposes is sufficiently heinous that greater detail in pleading is unnecessary under *Twombly.*

■ Second, the weight of authority holds that foreign citizens may invoke the TVPA. Defendants rely on *Arar v. Ashcroft,* 414 F.Supp.2d 250, 263 (E.D.N.Y. 2006), *aff'd,* 532 F.3d 157 (2d Cir.2008), where Judge Trager dismissed a TVPA claim on alternative grounds, one of which was that "U.S. citizens, and only U.S. citizens, are covered by the TVPA." However, in affirming on other grounds, the Second Circuit rejected, albeit in dictum, that conclusion: "We ... observe that past holdings of our Court, as well as those of our sister courts of appeals, strongly suggest

that TVPA actions may in fact be brought by non-U.S. citizens." The authority that the Circuit cited supports that view. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 104–05 (2d Cir.2000); *Kadic,* 70 F.3d at 236; *Arce v. Garcia,* 434 F.3d 1254, 1257–58 (11th Cir.2006); *Hilao v. Estate of Marcos,* 103 F.3d 767, 771 (9th Cir.1996).

■ Third, plaintiffs have failed to adequately plead that Khan acted "under color of law" of a foreign nation, as the statute requires. Although it is conceivable under the complaint that the torture of Chowdhury was a shared enterprise between Khan and the Bangladeshi police, it is just as conceivable that Khan was acting as a single, albeit illegally-intentioned, private actor, filing a complaint with the police and showing up at bail hearings to press his case just as would a legitimate crime victim. His physical presence at the police station during the administration of the electric shock is similarly not sufficient to establish Khan as a state actor; indeed, the complaint does not allege that Khan witnessed or even knew that the torture was occurring while he was there. There is nothing included about Khan's ability to control or manipulate the police to accomplish his illegal ends. In this regard, it is insufficient to rest on the conclusory allegation that Khan and the Bangladeshi authorities were "working together" without particulars of what that means.

■ Fourth, plaintiffs' claim of aiding and abetting a TVPA violation fails for the same reason as their aiding and abetting claim for an ATCA violation. The allegations are insufficient to show the level of participation required for aiding and abetting. This is undoubtedly because the theory does not fit the facts; the only plausible theory is that Khan was the principal and the Bangladeshi authorities were his agent.

■ Finally, plaintiffs concede that corporations cannot be liable under the TVPA. Conversely, and for the same reasons as their ATCA claims fail, the claims of the plaintiff corporations cannot stand because corporations cannot be tortured.

## CONCLUSION

All claims of the plaintiff corporations, Chowdhury's aiding and abetting claims and Chowdhury's TVPA claim against the defendant corporation are dismissed with prejudice. The remaining claims are dismissed with leave to replead within 30 days in accordance with this decision.

**SO ORDERED.**