09-4483-cv
*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

No. 09-4483-cv

NAYEEM MEHTAB CHOWDHURY,
*Plaintiff-Appellee,*

*v.*

WORLDTEL BANGLADESH HOLDING, LTD., AMJAD HOSSAIN KHAN,
*Defendants-Appellants.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 08-cv-1659 — Brian M. Cogan, *Judge.*

————

AUGUST TERM 2010

ARGUED: FEBRUARY 15, 2011
DECIDED: FEBRUARY 10, 2014

————

Before: CABRANES, POOLER and CHIN, *Circuit Judges.*

————

Defendants in this action, an individual corporate officer and an affiliated company, appeal from a judgment entered against them by the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) following a trial and jury verdict. Plaintiff, a citizen of Bangladesh and resident of the United States, instituted this suit alleging that defendants had directed a paramilitary unit of the Bangladeshi national police to detain and torture him in order to force him to turn over his ownership interest in a telecommunications company. The jury found defendants liable for violations of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350.

Upon review, we conclude that: (1) pursuant to the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), the conduct giving rise to this action occurred within the territory of another sovereign and, therefore, cannot form the basis for an action brought under the ATS; (2) the general verdict rule does not require that the judgment against defendant Khan be vacated with respect to plaintiff's TVPA claim since, on the facts of this case, the jury necessarily found Khan liable under that statute in returning a general verdict form; (3) plaintiff's TVPA claim was based on actionable torture, and was permissibly predicated on agency theories of liability; and (4) the District Court did not err in allowing plaintiff to testify at trial regarding certain statements made to him by foreign police agents while he was in custody in Bangladesh.

Accordingly, we **REVERSE** the judgment insofar as its rests on the claim brought under the Alien Tort Statute, we **AFFIRM** the judgment insofar as it rests on the claim under the Torture Victim Protection Act, and we **REMAND** the cause to the District Court for

2

such further proceedings as may be appropriate in the circumstances, including any appropriate adjustment for interest.

Judge Pooler joins in the judgment and opinion of the Court and files a separate opinion.

————

> J. ERIC CHARLTON (Angela C. Winfield, *on the brief*), Hiscock & Barclay, LLP, Syracuse, NY, *for Defendants-Appellants*.

> EVAN SARZIN (Karen E. Goldman, *on the brief*), Law Offices of Evan Sarzin, P.C., New York, NY, *for Plaintiff-Appellee.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

Defendants in this action, an individual corporate officer and an affiliated company, appeal from a judgment entered against them by the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) following a trial and jury verdict. Defendants were found liable for torture under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350. For the reasons that follow, we reverse the judgment insofar as its rests on the claim brought under the Alien Tort Statute; we affirm the judgment insofar as it rests on the claim under the Torture Victim Protection Act; and we remand the cause to the District Court

for such further proceedings as may be appropriate in the circumstances, including any appropriate adjustment for interest.[1]

## I. BACKGROUND

### A. Factual Background

Plaintiff-appellee Nayeem Mehtab Chowdhury ("Chowdhury" or "plaintiff"), who is the managing director of WorldTel Bangladesh Ltd. ("WorldTel Ltd") and a stockholder and officer of World Communications Investments Inc. ("WCII"), instituted this suit against his former business associate, defendant-appellant Amjad Hossain Khan ("Khan") and one of Khan's businesses, Worldtel Bangladesh Holding Ltd. ("WBH"). At all times relevant to this appeal, Chowdhury and Khan were citizens of Bangladesh with legal permanent resident ("LPR") status in the United States. Prior to the events giving rise to the current dispute, two of their businesses—WBH and WCII—jointly controlled a third entity, World Bangladesh Ltd ("WBL"), with both Chowdhury and Khan serving as members on its board of directors. At trial, Chowdhury, who was WBL's managing director, testified that WBL had a 25-year license to provide a full range of telecommunications services in Bangladesh, with projected five-year profits estimated to be "in excess of a hundred million dollars." Joint App'x 87.

In 2005, at Chowdhury's initiative, WBL issued new shares and took out additional debt, with the effect of reducing the interest that WBH (controlled by Khan) had in WBL, from fifty percent to less than one percent. Khan claims that Chowdhury employed improper corporate procedures and forged various signatures,

---

[1] As a general matter, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court . . . calculated from the date of the entry of the judgment . . . ." 28 U.S.C. § 1961(a).

including Khan's, in order to effect this change. Khan thereafter filed several official complaints against Chowdhury in Bangladesh, petitioning over 17 agencies and divisions of the Bangladeshi government for an official investigation of Chowdhury's actions.

Khan first complained to the Chief Metropolitan Magistrate in Bangladesh and to the Criminal Investigative Department of the Ministry of Home Affairs, each of which declined to pursue Khan's complaint after an independent investigation.[2] Khan next sought redress in 2007 with the Directorate General of Forces Intelligence ("DGFI"), an intelligence agency connected to the military. Following this complaint, in the summer of 2007, Chowdhury was summoned before the DGFI—with Khan present—and detained for 53 days, without charges and without access to anyone outside his room of confinement. Chowdhury testified at trial that he was released without any violence against his person during this period of detention by the DGFI.

However, Chowdhury also testified that on November 5, 2007, the Rapid Action Battalion ("RAB"), a paramilitary unit of the Bangladesh National Police to which Khan had also complained, arrested Chowdhury and held him, without any charges, until November 12, 2007. At trial, Chowdhury stated that during this second period of confinement, from November 5 to 12, 2007, the RAB tortured him, at Khan's direction, in order to force him to turn over his business interests in Bangladesh to Khan. Chowdhury further stated that, during his confinement by the RAB, he was blindfolded and handcuffed before electric shocks were applied to his thigh and arms through the use of an unidentified prodding device. Chowdhury testified that he was then lifted off his feet and

---

[2] Khan testified that he personally met with Bangladesh's Secretary of Home Affairs and complained to anybody he could think of in the government about Chowdhury's conduct.

suspended from the prison door by his handcuffs. He also stated in trial testimony that his interrogators told him they were acting at the behest of "Bahdi[, which is] a Bangla word for [Khan]." Joint App'x 137.

Chowdhury testified that he was subsequently transferred out of the RAB's custody and into the custody of the Dhaka Central Jail for medical treatment stemming from injuries sustained during the RAB's interrogation. Chowdhury also testified that, after the medical treatment, he was held for a further five months in jail before being released without any lasting medical symptoms aside from continuing nightmares.

Chowdhury's parents testified that they, and other family members, met with Khan during Chowdhury's detention by the RAB. The circumstances of that meeting were disputed at trial. Chowdhury's parents stated that Khan asked to see them and told them, upon meeting, that: (1) Chowdhury had been subjected to electric shock interrogation; (2) Khan was present for the interrogation; and (3) Khan could make the interrogations stop if Chowdhury agreed to transfer his business interests to Khan and leave Bangladesh entirely. Chowdhury's parents testified that they refused to agree to these alleged demands. In contrast, Khan testified that Chowdhury's parents requested the meeting and subsequently asked him to withdraw the charges he had filed with Bangladesh authorities against Chowdhury—which he refused to do. Khan also flatly denied seeing Chowdhury during his detention, having any influence over his treatment in detention, or offering to release Chowdhury if he agreed to transfer his business interests to Khan. There is no dispute that Chowdhury refused to transfer his interest in WBL and remains its managing director.

# B. Procedural History

On April 22, 2008, Chowdhury, WorldTel Ltd, and WCII (jointly, "plaintiffs") filed a complaint against Khan and WBH (jointly, "defendants"), alleging that Khan subjected Chowdhury to torture. On this basis, plaintiffs brought claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350, seeking monetary damages, punitive damages, and injunctive relief. In pressing these claims, plaintiffs alleged that defendants directly committed violations cognizable under the two statutes, as well as aided and abetted Bangladesh authorities in violations of the same. Defendants moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted. Upon review, the District Court dismissed with prejudice: (1) all claims by the plaintiff corporations; (2) Chowdhury's aiding and abetting claims under both the ATS and TVPA; and (3) Chowdhury's TVPA claim against WBH. *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F. Supp. 2d 375, 388 (E.D.N.Y. 2008). The District Court dismissed Chowdhury's remaining claims—those alleging that his interrogation by the RAB constituted direct violations by Khan of both certain customary international law norms (actionable in federal court under the ATS) and of the TVPA—and granted Chowdhury leave to replead. *Id*.

On January 5, 2009, Chowdhury, as the sole plaintiff, filed an amended complaint alleging only that the defendants directly[3] engaged in conduct prohibited, or otherwise made actionable, by the ATS and TVPA. Specifically, Chowdhury alleged that Khan caused

---

[3] Chowdhury did not re-file two claims alleging that defendants had aided and abetted violations under the TVPA and ATS.

the RAB to torture him through "electrical shocks and painful shackled standing" and offered to prevent future torture in exchange for control over WBL.

The parties then conducted discovery, which concluded on May 5, 2009. The case proceeded to trial on August 3, 2009. The jury, on August 4, 2009, returned a general verdict form in favor of Chowdhury in which it concluded that Khan and WBH were liable for torture. It found Khan and WBH liable for $1.5 million in compensatory damages and Khan alone liable for $250,000 in punitive damages. The jury further determined that WBH should not be held liable for punitive damages.

Following the jury's verdict, defendants brought a motion pursuant to Federal Rules of Civil Procedure 50(b) and 59(a) seeking judgment as a matter of law, or in the alternative, a new trial. The District Court denied the motion, concluding that the evidence at trial "was not only legally sufficient to present the case to the jury, but one sided in plaintiff's favor." *Chowdhury v. Worldtel Bangladesh Holding, Ltd*., No. 08 Civ. 1659(BMC), 2009 WL 9053203, at *1 (E.D.N.Y. Sept. 16, 2009). The District Court also noted that the jury could have reasonably determined from testimony not only that Khan had knowledge that Chowdhury was being tortured, but also that the RAB was acting "at the behest of [Khan]" and that Khan attended the torture.[4] *Id*. Overall, the District Court concluded that under a theory of agency or conspiracy, "[t]he facts set forth . . . were more than sufficient to permit the jury to infer that defendant had a deal with the torturers to extract business concessions from [Chowdhury] by doing what they do best." *Id*.

---

[4] The District Court noted, for instance, that evidence of an email sent from Khan to one of Chowdhury's associates, after the latter's arrest by the RAB, was "particular[ly] damning," and that Khan's explanation of the message while testifying before the jury "was somewhat shocking." *Chowdhury*, 2009 WL 9053203, at *1.

In considering the motion, the District Court also rejected multiple evidentiary challenges by defendants. As relevant here, defendants contended that Chowdhury should not have been allowed to testify regarding statements by RAB agents that they were torturing him at Khan's direction. *Id*. at *2. In dismissing this challenge, the District Court concluded that the statement was properly admitted as the statement of an agent or coconspirator because "the jury could reasonably infer that the reason the RAB let [Chowdhury] know why they were torturing him was to induce surrender which would further the aims of the agency and conspiracy." *Id*.

The District Court entered judgment in favor of Chowdhury on August 6, 2009, and denied defendants' motion for judgment as a matter of law on September 16, 2009.

This appeal followed. After oral argument on February 15, 2011, our resolution of the appeal was held in abeyance pending the Supreme Court's review of another ATS case from this Circuit, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010). On October 17, 2011, the Supreme Court granted the petition for a writ of certiorari in *Kiobel* to consider whether the law of nations recognizes corporate liability. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2013) ("*Kiobel*"). Following oral argument on February 28, 2012, the Supreme Court, on March 5, 2012, restored the case to its calendar for reargument on the additional question of "[w]hether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Kiobel v. Royal Dutch Petroleum*, 132 S. Ct. 1738 (2012) (order directing supplemental briefing and reargument). Reargument was held on October 1, 2012, and on April 17, 2013, the Supreme Court affirmed the judgment of the Court of Appeals, but on different grounds,

holding that "the presumption against extraterritoriality applies to claims under the ATS," and that "relief [under the ATS] for violations of the law of nations occurring outside the United States is barred." 133 S. Ct. at 1669. The *Kiobel* action having concluded, we directed the parties in the instant appeal to submit supplemental briefing on the impact, if any, of the Supreme Court's decision in *Kiobel*. We now address their arguments.

## II. DISCUSSION

On appeal, defendants raise four principal arguments: (1) Chowdhury's ATS claims against both Khan and WBH must be dismissed under the Supreme Court's holding in *Kiobel* due to their extraterritorial nature; (2) under the general verdict rule, Chowdhury's TVPA claim against Khan must also be dismissed; (3) Chowdhury's TVPA claim ought to be dismissed because the underlying conduct was extraterritorial and did not constitute actionable torture, and because the claim was predicated on improper agency theories of liability; and (4) Chowdhury's testimony regarding the RAB's statements constituted hearsay under Federal Rule of Evidence 801 and was improperly admitted because it was unfairly prejudicial. We consider these arguments in turn.

## A. Standards of Review

We review *de novo* a denial of a motion for judgment as a matter of law. *See Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010). "In undertaking this review, we view the evidence in the light most favorable to the party against which the motion was made . . . [and] draw[ ] all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant . . . ." *Id.* (citations and internal quotation

marks omitted). We review a district court's denial of a Rule 59 motion for a new trial for abuse of discretion. *See United States v. Rigas*, 583 F.3d 108, 125 (2d Cir. 2009); *see also In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining that the term of art "abuse of discretion" includes errors of law, clearly erroneous assessments of the evidence, or decisions "that cannot be located within the range of permissible decisions" (internal quotation marks omitted)). We explain the relevant standard of review regarding Khan's challenge to the admission of out-of-court statements in our discussion of that issue.

## B. ATS Claims

Defendants first argue that the judgment entered against them pursuant to the ATS must be reversed in light of the Supreme Court's recent ruling in *Kiobel*. The unique history and purpose of the ATS has been described at length by the Supreme Court, by the lower courts, and by scholars, and need not be reiterated here.[5] The ATS provides "original jurisdiction" in the federal district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In *Sosa v. Alvarez-Machain*, *542* U.S. 692, 712 (2004) ("*Sosa*"), the Supreme Court recognized that "the ATS is a jurisdictional statute creating no new causes of action," but that it indicates Congressional intent that "the common law would provide a cause of action for [a] modest number of international law

---

[5] *See, e.g.*, *Kiobel*, 133 S. Ct. at 1663; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004); *Kiobel*, 621 F.3d at 115; *Filartiga v. Pena-Irala*, 630 F.2d 876, 887 (2d Cir. 1980); *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.) ("This old but little used section is a kind of legal Lohengrin . . . no one seems to know whence it came."), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010); Anthony J. Bellia Jr. & Bradford R. Clark, *The Alien Tort Statute and the Law of Nations*, 78 U. CHI. L. REV. 445 (2011); Curtis A. Bradley, *The Alien Tort Statute and Article III*, 42 VA J. INT'L L. 587 (2002).

violations" based on a "norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" familiar to those who enacted the statute. *Sosa*, 542 U.S. at 724-25; *see also id.* at 731 n.19 (explaining that the ATS, although a grant of jurisdiction, "carries with it an opportunity to develop common law").

While this appeal was pending, the Supreme Court in *Kiobel* further clarified the scope of the ATS by holding that "the presumption against extraterritoriality applies to claims under the ATS," and concluding that "relief [under the ATS] for violations of the law of nations occurring outside the United States is barred." 133 S. Ct. at 1669 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2883 (2010)). Writing for the Court, the Chief Justice further noted that "all the relevant conduct [in *Kiobel*] took place outside the United States," and therefore the plaintiffs' "case seeking relief for violations of the law of nations occurring outside the United States is barred." *Id*.

Applying the holding of *Kiobel* to the facts of this case, we conclude that, pursuant to the rule enunciated by the Supreme Court, there is no legally sufficient basis to support the jury's verdict with respect to plaintiff's claim under the ATS. As described in Part I, *ante*, "all the relevant conduct" set forth in plaintiff's complaint occurred in Bangladesh, *Kiobel*, 133 S. Ct. at 1669, and therefore plaintiff's claim brought under the ATS is "barred,"[6] *id*; *see also*

---

[6] Plaintiff's claims under the ATS against WBH encounter a second obstacle as well: the Supreme Court's decision in *Kiobel* did not disturb the precedent of this Circuit, *see Kiobel*, 621 F.3d at 145, *aff'd on other grounds by* 133 S. Ct. at 1669, that corporate liability is not presently recognized under customary international law and thus is not currently actionable under the ATS. *See Baraket v. Holder*, 632 F.3d 56, 59 (2d Cir. 2011) ("'A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.'" (quoting *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998)). We also note that Chowdhury's amended complaint did not state a

*Balintulo v. Daimler AG*, 727 F.3d 174, 189-90 (2d Cir. 2013) ("[C]laims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States . . . . [I]f all the relevant conduct occurred abroad, that is simply the end of the matter under *Kiobel*."). Accordingly, the judgment must be reversed insofar as it rests on plaintiff's claims under the ATS.

## C. TVPA Claim

### i. General Verdict Rule

Second, defendants argue that it is impossible to know whether the jury found in favor of plaintiff on the basis of an ATS or TVPA theory of liability. As a consequence, defendants contend, if the ATS claim must be vacated then the judgment must be vacated in its entirety and the cause remanded for a new trial.

The Supreme Court decades ago announced the so-called general verdict rule, that "a new trial will be required" where "there is no way to know that [an] invalid claim . . . . was not the sole basis for [a] verdict." *United N.Y. & N.J. Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959); *see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 30 (1962); *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 313 (4th Cir. 2012) ("The Supreme Court has recognized that when a jury issues a general verdict on multiple theories of liability and one of those theories is overturned on appeal, the entire verdict falls.").

---

TVPA claim against WBH. *See Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1710 (2012) (holding that "Congress did not extend liability to organizations" under the TVPA).

Numerous subsequent courts, however, "have engrafted a . . . harmless error gloss onto the basic principle." *Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006). So it is that we have recognized, in this context, that "[h]armless error arises when we are sufficiently confident that the verdict was not influenced by an error in the jury charge." *Bruneau v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 759-760 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009); *see also Tire Eng'g & Distribution*, 682 F.3d at 314; *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30 (1st Cir. 2004) ("[W]e have generously applied the harmless error concept to rescue verdicts where we could be *reasonably sure* that the jury in fact relied upon a theory with adequate evidentiary support.").

Applying a harmless error analysis to the facts of the instant case, we have no difficulty in concluding, as we discuss below, that there was indeed adequate evidentiary support for a jury to find the defendants liable for torture under the TVPA. Under the straightforward circumstances of this case, plaintiff's claim brought under the ATS and his claim under the TVPA both stemmed from the same alleged acts of torture, and Khan can point to no circumstances in which the jury could have found him liable under the ATS but not the TVPA.

### ii. Other Challenges to the TVPA Claim: Extraterritoriality, Torture, and Agency

#### a. *Extraterritoriality*

Defendant Khan also raises other challenges to the validity of judgment entered against him under plaintiff's TVPA claim. All of his arguments lack merit.

First, Khan asserts that the conduct underlying the TVPA claim here "do[es] not 'touch and concern' the United States," Appellant's Supp. Letter Br. 4 (quoting *Kiobel*, 133 S. Ct. at 1669), and we must therefore exercise a "'vigilant door keeping' function," *id*. (quoting *Sosa*, 542 U.S. at 732-33), to bar it. We find no support in *Kiobel* or any other authority for the proposition that the territorial constraints on common-law causes of action under the ATS apply to the statutory cause of action created by the TVPA. Rather, we must conduct a separate statutory analysis with respect to the TVPA to determine whether that statute—not the ATS—"'gives . . . clear indication of an extraterritorial application.'" *Kiobel*, 133 S. Ct. at 1664 (quoting *Morrison*, 130 S. Ct. at 2878). Under this separate analysis, we conclude that the TVPA, unlike the ATS, has extraterritorial application.

Our analysis begins with the text of the statute. Congress created civil liability in the TVPA, *inter alia*, for torture and extrajudicial killing carried out by an individual with "actual or apparent authority, or color of law, of *any foreign nation*." TVPA § 2(a) (emphasis supplied). Although this language could conceivably refer to conduct occurring within the United States, the provision is more naturally understood to address primarily conduct occurring in the territory of foreign sovereigns.[7] The legislative history of the TVPA unambiguously supports that conclusion. *See* S. Rep. No. 102–249, p. 3-4 (1991) ("A state that practices torture and summary execution is not one that adheres to the rule of law. Consequently, the Torture Victim Protection Act (TVPA) is designed to respond to this situation by providing a civil

---

[7] Justice Kennedy—one of the five Justices who joined the *Kiobel* majority opinion—explicitly endorsed the extraterritorial reach of the TVPA in his concurring opinion in *Kiobel*, noting that the TVPA addresses "human rights abuses *committed abroad*." *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J., concurring) (emphasis added).

cause of action in U.S. courts for torture committed abroad."); H.R. Rep. No. 102–367, pt. 1, p. 4 (1991) (noting Judge Bork's skepticism in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), as to whether "victims of torture committed in foreign nations" could bring a cause of action under the ATS absent an explicit grant of a cause of action and stating that the "TVPA would provide such a grant"). Thus, we find no bar on the basis of extraterritoriality to Chowdhury's TVPA claim.[8]

### b. Torture

Second, Khan argues that the facts presented do not constitute torture under the TVPA, because not all police brutality is actionable under the statute. It is clearly true, of course, that not all conduct falling under the journalistic and political rubric of "police brutality," whether here or abroad, can be described as "torture," but a review of the particular facts of this case persuades us that the jury could have properly found the conduct presented to constitute torture under the TVPA. The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as

---

[8] Although the parties do not raise the issue, we note that our affirmance of plaintiff's TVPA claim here necessarily recognizes that aliens—not just American citizens—may bring suit under the TVPA, a conclusion that we have relied upon, but not made explicit, in prior decisions. *See Arar v. Ashcroft*, 532 F.3d 157, 176 n.13 (2d Cir. 2008) (observing "that past holdings of our Court, as well as those of our sister courts of appeals, strongly suggest that TVPA actions may in fact be brought by non-U.S. citizens," and collecting authorities), *vacated and superseded, on other grounds, on rehearing en banc*, 585 F.3d 559, 568 (2d Cir. 2009).

obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA § 3(b)(1). While "torture [under this definition] does not automatically result whenever individuals in official custody are subjected even to direct physical assault," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002), we conclude that the term "torture" can apply to powerful electric shocks administered to the body, when the fact-finder determines that the shocks are sufficiently severe. This conclusion is bolstered by the numerous courts of appeals that have referred to electric shocks as an instrument of torture. *See, e.g.*, *Jean-Pierre v. U.S. Attorney General*, 500 F.3d 1315, 1324 n.6 (11th Cir. 2007) (noting that electric shock can constitute torture within the meaning of the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, the multilateral international convention upon which the TVPA was based); *see also Cherichel v. Holder*, 591 F.3d 1002, 1009, n.11 (8th Cir. 2010) (electric shock may rise to the level of torture); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir. 2007) (same); *Lhanzom v. Gonzales*, 430 F.3d 833, 848 (7th Cir. 2005) (same); *United States v. Webster*, 392 F.3d 787, 794 (5th Cir. 2004) (same); *Price*, 294 F.3d at 92-93; *Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir. 2003) (same).

Additionally, the TVPA contemplates the "purposes" for which torture might be undertaken by the perpetrator, and specifically lists "intimidating or coercing" the victim among them.

TVPA § 3(b)(1). Here, defendants subjected Chowdhury to electric shocks for the distinct purpose of coercing him to relinquish his business interests to Khan.

In this case, moreover, the District Court took particular care to instruct the jury on the definition of torture in a manner consistent with the one provided by the TVPA, stating that "[t]he severity requirement is crucial in determining whether conduct is torture" and that "an act must be a deliberate and calculated act of an extremely cruel and inhuman nature specifically intended to inflict excruciating and agonizing physical or mental pain or suffering" in order to constitute torture.[9] Joint App'x 213. Accordingly, we find that plaintiff's allegations of being subject to electric shock while detained by the RAB were properly actionable as torture under the TVPA.

### c. Agency

Third, Khan claims that the jury's verdict was predicated on improper agency theories of liability, arguing that any brutality by RAB agents was not attributable to him. We disagree. The weight of authority makes clear that agency theories of liability are available in the context of a TVPA claim.

For a claim of torture to be actionable under the TVPA, a plaintiff must demonstrate, *inter alia*, that a defendant acted "under actual or apparent authority, or color of law, of any foreign nation." TVPA § 2(a). To determine whether a defendant acted under color of foreign law, we look to "principles of agency law and to jurisprudence under 42 U.S.C. § 1983." *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). Under those principles, "[f]or purposes of the

---

[9] Indeed, the District Court further instructed the jury, properly, that not all physical assaults, instances of police brutality, or excessive force rise to the level of torture.

TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid." *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam) (internal quotation marks omitted), *aff'd for want of a quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008); *Kadic*, 70 F.3d at 245 (same); *cf. Arar*, 585 F.3d at 567-568 ("[T]o state a claim under the TVPA, [plaintiff] must adequately allege that the defendants possessed power under [foreign] law, and that the offending actions . . . derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power."). Khan, who was found to have conspired with state authorities in Bangladesh, thus clearly acted under color of law within the meaning of the TVPA.

Agency law, however, does not simply apply to the question whether a defendant acts under color of law; it also can provide a theory of tort liability if a defendant did not personally torture the victim. As the Supreme Court recently explained in *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), "Congress is understood to legislate against a background of common-law adjudicatory principles," *id.* at 1709 (quotation marks omitted), and therefore "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing," *id.* (citing *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009)).

Congress has not, in other words, "specified" any "intent" that traditional agency principles should not apply under the TVPA. *Meyer v. Holley*, 537 U.S. 280, 287 (2003); *see also* S. Rep. No. 102-249, at 9 (1991) (noting that "responsibility for torture . . . extends beyond the person or persons who actually committed those acts"); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (holding that "the [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act"). Accordingly, an individual can be

liable for "subject[ing]" the victim to torture even if his agent administers the torture,[10] *see* TVPA § 2(a)(1), and the District Court did not err in permitting agency theories of liability to be submitted to the jury.[11]

### D. Admission of Out-of-Court Statements

Finally, Khan argues that the District Court erred in allowing Chowdhury to testify about statements made by RAB agents while he was in their custody. The District Court admitted these statements as statements of an agent or coconspirator pursuant to

---

[10] The District Court dismissed the aiding-and-abetting claim against Khan, and therefore we need not address whether the TVPA recognizes that theory of liability—an "ancient criminal law doctrine" that is generally presumed not to apply in civil suits. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181-82 (1994); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013).

[11] Khan raises a number of claims regarding the specific agency theories upon which the District Court instructed the jury, all of which lack merit. First, Khan claims that "there was no evidence of an agreement" between him and members of the RAB. Appellants' Br. 15. Having conducted a review of the record, we identify no support for this argument, and therefore reject it. Second, Khan argues that a ratification theory of agency can be used "only with respect to a parent corporation's liability for a subsidiary's acts." Appellants' Br. 18. We perceive no basis in tort law or agency law for Khan's argument, *see, e.g.*, Restatement (Third) of Agency § 7.04 (outlining the bases for liability on a ratification theory of agency), and further determine that the ratification theory of agency was amply supported by the record evidence in this case. Finally, Khan raises a perplexing claim that the District Court's instruction on willful participation liability was "essentially the same as [an instruction] on aiding and abetting," and since the District Court had already dismissed the aiding and abetting claims, it should not have instructed the jury on willful participation. Appellants' Br. 21. Whether someone is a "willful participant in joint action with the State or its agents," however, is the standard for determining whether a private actor acts under color of law, s*ee Dennis v. Sparks*, 449 U.S. 24, 27 (1980), and is plainly not, as Khan asserts, merely an alternative instruction on an aiding-and-abetting theory. Accordingly, we conclude that Khan's claims regarding the agency theories upon which the District Court instructed the jury all lack merit.

Federal Rule of Evidence 801(d)(2).[12] We review a district court's evidentiary rulings for "abuse of discretion." *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). Whether certain evidence is hearsay is generally a question of law that is reviewed *de novo*, *see United States v. Ferguson*, 676 F.3d 260, 285 (2d Cir. 2011), but the admission of evidence under Rule 801(d)(2) is generally based on a district court's assessment of whether the evidence is sufficient to trigger one of the Rule's five exceptions, and therefore we generally review for "clear error" a district court's decision, pursuant to Rule 801(d)(2), to admit evidence that would otherwise constitute hearsay, *see id.* at 285 & 285 n.27; *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012). Having reviewed the record in light of this standard, we find no error, much less clear error, in the District Court's admission of the testimony. Accordingly, we reject defendants' evidentiary challenge substantially for the reasons set forth in the District Court's ruling of August 4, 2009, and in our prior discussion of the sufficiency of the evidence with respect to agency liability, *see* Part II(C)(ii)(c), *ante*.

---

[12] Rule 801(d)(2) provides that a statement is not hearsay if it is offered against "an opposing party" and it:

> (A) was made by the party in an individual or representative capacity;

> (B) is one the party manifested that it adopted or believed to be true;

> (C) was made by a person whom the party authorized to make a statement on the subject;

> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

## CONCLUSION

We have reviewed all of Khan's arguments on appeal and summarize our holdings as follows:

(1) The conduct giving rise to this action occurred within the territory of another sovereign and, therefore, pursuant to the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), cannot form the basis for an action brought under the Alien Tort Statute, 28 U.S.C. § 1350.

(2) The general verdict rule does not require that the judgment against defendant be vacated with respect to plaintiff's claim under the Torture Victim Protection Act, 106 Stat. 73, note following 28 U.S.C. § 1350, because, on the facts of this case, the jury necessarily found defendant Khan liable under that statute in returning a general verdict in favor of plaintiff.

(3) Plaintiff's claim under the Torture Victim Protection Act was based on actionable torture, and permissibly predicated on agency theories of liability.

(4) The District Court did not err in allowing plaintiff to testify at trial regarding certain statements made to him by foreign police agents, who were agents or coconspirators of the defendant.

For the reasons stated above, we **REVERSE** the judgment of the District Court insofar as its rests on claims brought under the Alien Tort Statute, and we **AFFIRM** the judgment insofar as it rests on a claim brought under the Torture Victim Protection Act. We **REMAND** the cause to the District Court for such further

proceedings as may be appropriate in the circumstances, including any appropriate adjustment for interest.

ROSEMARY S. POOLER, Circuit Judge, concurring:

I am pleased to concur in the concise and thorough opinion of this Court. I write separately for the sole purpose of emphasizing the narrowness of this Court's disposition with respect to the implications of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), for claims brought under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"). This narrowness is tied to considerations regarding which claims do not "touch and concern the territory of the United States," *Kiobel*, 133 S. Ct. at 1669, and conclusions which are driven by the facts and arguments made in the case before us on appeal.

## I. *KIOBEL*

As our opinion describes, we have held in abeyance decision on this appeal since the case was argued on February 15, 2011. **Maj. Op. at [9]**. Our resolution of this appeal was held in abeyance pending the resolution of the question of "whether the law of nations recognizes corporate liability." **Maj Op. at [9]** (citing *Kiobel*, 133 S. Ct. at 1663).[1] After oral argument on these questions, the Supreme Court ordered reargument on a third question: "'[w]hether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States.'" **Maj Op. at [9]** (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 1738 (2012)).

---

[1] The petition for certiorari that was granted also included the question of whether corporate liability under the ATS was a question of subject matter jurisdiction, or a merits issue. *See* Brief for Petitioner at i *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), 2011 WL 2326721 at *i.

The Supreme Court did not explicitly answer the questions posed in the first petition for certiorari which caused us to hold resolution of this appeal in abeyance.[2] Rather, it affirmed the decision of this Court by requiring reargument on, and then answering, the third question above, a question the Supreme Court put before the parties of its own accord. In affirming, the Supreme Court reasoned that, as a matter of statutory interpretation, the "principles underlying the presumption against extraterritoriality . . . constrain courts exercising their power under the ATS." *Kiobel*, 133 S. Ct. at 1665. But as to the question of "whether" the ATS allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States, the answer was an unequivocal "Yes." Concluding as much is required by the manner in which the Supreme Court answered the question of the "circumstances" under which courts might recognize such a cause of action, reasoning as follows: "[W]here the claims [under the ATS] touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 133 S. Ct. at 1669.[3] Reasoning that "[o]n [the] facts [in *Kiobel*], all the relevant

---

[2] At least one sister circuit has determined that, by not passing on the question of corporate liability and by making reference to "mere corporate presence" in its opinion, the Supreme Court established definitively the possibility of corporate liability under the ATS. *Doe I v. Nestle USA, Inc.*, 738 F.3d 1048, 1049 (9th Cir. 2013) (citing *Kiobel*, 133 S. Ct. at 1669). The relevance of the Supreme Court's reference to corporate presence for the disposition of this case need not be explored here, because as the majority opinion notes, and as I agree, "all of the relevant conduct" took place in Bangladesh. **Maj. Op. at [12].** As such, the assertion that *Kiobel* "did not disturb the precedent of this Circuit" with respect to corporate liability, **Maj. Op. at [12 n.6],** is not pertinent to our decision, and thus is dicta.

[3] I note that some of the district courts to have considered the issue have apparently split on the import of this language. *Compare, e.g.*, *Sexual Minorities Uganda v. Lively*, --- F. Supp. 2d ---, 2013 WL 4130756, at *15 (D. Mass. Aug. 14, 2013) ("Given that Defendant is a United States citizen living in this country and that the claims against him 'touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritoriality,' a cause of action is appropriate under the

2

conduct took place outside the United States," and further reasoning "that mere corporate presence [of a defendant]" would also not "suffice[]" to displace the presumption against extraterritorial application of a United States statute, specifically the ATS, the Supreme Court affirmed our dismissal of plaintiffs' claims in *Kiobel*.

The affirmance was unanimous, although it drew three concurrences. Justice Alito, joined by Justice Thomas, concurred "in the judgment and join[ed] the opinion of the Court as far as it goes." *Id.* at 1669 (Alito, J., concurring). Specifically, Justice Alito noted that the question of whether claims "touch and concern the territory of the United States" was a "formulation [that] obviously leaves much unanswered." *Id.* Justice Alito would have gone farther, however, and concluded that "a putative ATS cause of action will fall within the scope of the presumption against extraterritoriality . . . unless the domestic conduct is sufficient to violate an international law norm that satisfies Sosa's requirements of definiteness and acceptance among civilized nations." *Id.* at 1670. Justice Alito characterized this as a "broader standard." *Id.*

Justice Breyer, joined by Justices Ginsburg, Sotomayor, and Kagan, concurred in the judgment only. Justice Breyer would have reached the disposition of the majority not by invoking the presumption against extraterritoriality, but rather by invoking the "principles and practices of foreign relations law." *Id.* at 1670 (Breyer, J., concurring). As such, Justice Breyer would have concluded that a

ATS." (quoting *Kiobel*, 133 S. Ct. at 1669)), *with Al Shimari v. CACI Intern., Inc.*, --- F. Supp. 2d ---, 2013 WL 3229720, at *9 (E.D. Va. June 25, 2013) (noting that "Plaintiffs' reading of *Kiobel* [supporting extraterritorial application of the ATS in some circumstances] is a fair one," because *Kiobel*'s "'touch and concern' language is textually curious, and may be interpreted by some as leaving the proverbial door ajar," but nonetheless dismissing plaintiffs' claims). At this writing, one of our sister circuits has seen fit to vacate its prior rule on the question of extraterritoriality and remand to the district court for further consideration of the issue. *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7 (D.C. Cir. 2013).

3

federal court could find jurisdiction under the ATS under three circumstances: "(1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest . . . ." *Id.* at 1671. Because none of the three conditions were satisfied in *Kiobel*, Justice Breyer would have affirmed our dismissal of the plaintiffs' claims in *Kiobel*. Justice Kennedy, writing for himself, concurred in the Court's opinion. His concurrence, in full, is as follows:

> The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute. In my view that is the proper disposition. Many serious concerns with respect to human rights abuses committed abroad have already been addressed by Congress in statutes such as the Torture Victims Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U.S.C. § 1350, and that class of cases will be determined in the future according to the detailed statutory scheme Congress has enacted. Other cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the TVPA nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation.

*Id.* at 1669 (Kennedy, J., concurring).

## II. CHOWDHURY'S CLAIMS

Drawing from the principles and reasoning of the Supreme Court in *Kiobel*, I am convinced that this is not a case covered "neither

4

by the TVPA nor by the reasoning and holding of" *Kiobel*, and thus is not a case in which "the proper implementation of the presumption against extraterritorial application [] require[s] some further elaboration . . . ." *Id.* at 1669 (Kennedy, J., concurring). This is true for several reasons.

*First*, as our opinion makes clear, in this case the plaintiff has a clear avenue of relief available to him in the form of the TVPA. **Maj. Op. at [13-20]**. Having pursued this avenue for relief for conduct outside of the United States, Chowdhury has vindicated the interests which we first identified in the ATS, namely, to hold accountable a torturer, who "has become like the pirate and slave trader before him hostis humani generis, an enemy of all mankind." *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980).

*Second*, our opinion draws on one set of questions explicitly identified by the majority in *Kiobel* to determine whether a claim sufficiently touches and concerns the United States, by focusing on the conduct of defendants in this case.[4] We therefore explain that "'all the relevant conduct'" set forth in plaintiff's complaint occurred in Bangladesh." **Maj. Op. at [12]** (quoting *Kiobel*, 133 S. Ct. at 1669). Further still the complaint alleges not just that all relevant conduct, but that all conduct claimed in this case, occurred in Bangladesh. Finally, there was no evidence adduced at trial to indicate any conduct relevant to Chowdhury's ATS claim took place in the United States.

---

[4] We have no cause in this case to focus on the nationality of the defendant, as he is a Bangladeshi citizen. The *Kiobel* Court at least implied that nationality could be relevant for determining whether a claim brought under the ATS would "touch and concern" the territory of the United States, as the *Kiobel* Court determined that "it would reach too far" for "mere corporate presence" to suffice to make out a claim under the circumstances in *Kiobel*. 133 S. Ct. at 1669.

Chowdhury does not seriously contest this factual matter on appeal. Haphazardly, he avails, "[Khan] maintained his residence and business in the United States while directing the acts of torture to be carried out in Bangladesh. He may well have directed some of those acts from his U.S. residence." Pl. Letter Br. at 7, May 10, 2013. Chowdhury points to no evidentiary basis to support this claim. In point of fact, trial testimony from Chowdhury's own mother and father supported the conclusion that Khan was in Bangladesh at the time of Chowdhury's torture. And Khan himself testified, at the time of trial in 2009, that though he had a residence in the United States, he had been living in Bangladesh for four years prior, including during 2007, when the RAB engaged in acts of torture at Khan's instigation. And of course there is no dispute that Chowdhury's torture occurred entirely within Bangladeshi holding facilities, at the hands of the RAB, a Bangladeshi force. Thus, the fact that all conduct (both relevant to the ATS claim and otherwise) took place outside the United States renders our case firmly on point with the facts and holding of *Kiobel*.

*Third*, the distinctions recognized in our opinion today, and which were recognized in *Kiobel* as well, go to the crux of the presumption against extraterritoriality. As the Supreme Court noted in *Morrison v. National Australian Bank Ltd.*, the mere relevance of the "presumption . . . is not self-evidently dispositive, but its application requires further analysis." 130 S. Ct. 2689, 2884 (2010). In *Morrison*, further analysis required the Court to examine the "focus" of the Securities Exchange Act, and led to the conclusion that the Act would cover situations where "the purchase or sale [of a covered security] is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 2886. The analogous analytical work of the Supreme Court in *Kiobel* led it to adopt a rule under the ATS which was "careful to leave open a number of significant questions regarding [its] reach and interpretation." *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J.,

concurring). These questions require courts to answer, at least, whether the claims "touch and concern the territory of the United States." *Id.* at 1669. Because the record establishes that the claims alleged in this case involve conduct that took place entirely in Bangladesh, I am convinced that we need not elaborate on what facts, if alleged or proved, might lead us to conclude that claims touch and concern the United States. The elaboration of such "significant questions," *id*. at 1669 (Kennedy, J., concurring), is properly left to a further panel of this Court.

With these considerations in mind, I concur.

7