*08-4630-cv*
*Highland v. Schneider, et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: September 22, 2009          Decided: June 22, 2010
         Errata filed:   June 22, 2010)

Docket No. 08-4630-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Highland Capital Management LP,

       *Plaintiff-Appellee*,

RBC Dominion Securities Corp.,

       *Third-Party-Defendant-Counter-Claimant-Appellee*,

v.

Leonard Schneider, Leslie Schneider, Scott Schneider, Susan Schneider,

       *Defendants-Third-Party-Plaintiffs-Counter-Defendants-Appellants,*

Jenkins & Gilchrist Parker Chapin LLP,

       *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL and RAGGI, *Circuit Judges,* and COTE, *District Judge.*[*]

Defendants Leonard, Leslie, Scott, and Susan Schneider appeal from the judgment of the United States District Court for the Southern District of New York (Leisure, *J.*), entered after trial in favor of Plaintiff Highland Capital Management LP and Counter-Claimant RBC Dominion Securities Corp. on the basis of the jury's verdict, and from the court's denial of Defendants' motion for judgment as a matter of law or a new trial. Through an agent, Defendants engaged in negotiations for the sale of certain promissory notes to RBC, which planned to convey them to Highland. Highland and RBC alleged that Defendants' agent made an oral agreement to sell the notes to RBC at a significant discount. Defendants refused to deliver the notes, denying that any agreement of sale had been made. Because the evidence was insufficient to support a finding that Defendants' agent had actual or apparent authority to make the contract on Defendants' behalf or that he made such a contract, the Court of Appeals (Leval, *J.*) reverses the judgment.

PAUL B. LACKEY, Lackey & Hershman, LLP, Dallas, TX (Jamie R. Welton and Kristen A. Miller Reinsch, *on the brief*), for *Plaintiff-Appellee.*

MICHAEL J. McNAMARA, Seward & Kissel LLP, New York, NY (Jack Yoskowitz, *on the brief*), for *Third-Party-Defendant-Counter-Claimant-Appellee.*

EDWIN G. SCHALLERT, Debevoise & Plimpton LLP, New York, NY (Steven Klugman, Robert H.

---

[*] The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation.

Chandler, and Courtney M. Dankworth of Debevoise & Plimpton LLP and Alvin M. Stein and Katherine C. Ash of Troutman Sanders LLP, *on the brief*), for *Defendants-Third-Party-Plaintiffs-Counter-Defendants-Appellants*.

LEVAL, *Circuit Judge*:

Defendants Leonard Schneider ("Schneider") and his children, Leslie, Scott, and Susan Schneider (collectively, "Defendants" or "the Schneiders") appeal from the judgment of the United States District Court for the Southern District of New York (Leisure, *J.*), which held them liable for damages to Plaintiff Highland Capital Management LP ("Highland") and Counter-Claimant RBC Dominion Securities Corp. ("RBC") (jointly, "Appellees"), pursuant to a jury verdict after trial, in the amount of approximately $40 million for breach of an alleged contract for the sale of promissory notes. Highland claimed to be the third-party beneficiary of an alleged contract by which the Schneiders, acting through an agent, Glen Rauch Securities ("GRS"), agreed to sell promissory notes of the McNaughton Apparel Group, Inc. ("McNaughton") at fifty-one percent of their face value to RBC. Appellees contend that, after several weeks of negotiation between Glen Rauch of GRS, acting for the Schneiders, and RBC, they concluded the alleged contract in an unrecorded telephone conversation on March 14, 2001. The Schneiders argue, among other contentions, that there could be no contract because their agent, GRS, had neither actual nor apparent authority to make the alleged contract on their behalf. We agree with the Schneiders that the evidence cannot support a finding that Rauch had either actual or apparent authority to make the contract or even that he expressed agreement to sell the notes. We therefore remand to the district court with instructions to set aside the verdict and enter

judgment in favor of the Schneiders.

**BACKGROUND**

The evidence at trial, seen in the light most favorable to Appellees, showed the following. The Schneiders owned and operated two apparel businesses, which they sold to McNaughton in April 1998. In connection with this sale, they received McNaughton's promissory notes for $69 million. The Schneiders later became interested in selling the notes. To assist them in making the sale, they engaged GRS, which acted through its principal, Glen Rauch. Rauch contacted RBC as a potential purchaser. Before beginning negotiations in earnest over the sale of the notes, RBC and Rauch executed a Letter Agreement outlining the terms of the negotiations. The agreement stated:

> Reference is made to certain promissory notes [of McNaughton] . . . held by [the Schneiders].
> [RBC] understand[s] that Glen Rauch Securities, Inc. ("GRS") represents [the Schneiders] in the possible resale of some or all of the Notes. . . .
> . . .
> We both understand that the consummation of any transaction remains in the sole discretion and satisfaction of the [Schneiders] and [RBC], including without limitation with respect to price.

Pl.'s Ex. 20. Rauch instructed RBC that its communications concerning the proposed transaction should go through him and that it should not communicate directly with the Schneiders.

RBC intended to purchase the notes incurring only minimal risk by, prior to purchase, arranging to resell them to a third party at a markup over its own purchase price. During the course of its negotiations with the Schneiders, RBC received bids for the notes from Highland and another firm.

Most of the negotiations for RBC's purchase of the notes from the Schneiders were conducted by telephone, between Kenneth Ambrecht of RBC and Rauch. Because of doubts about McNaughton's solvency, the negotiations discussed prices representing a 35-60% discount from the face value of the notes. The content of the negotiations is largely undisputed, because RBC routinely recorded all telephone calls through its trading desk. The recordings of the conversations between Rauch and RBC show that, in accordance with the Letter Agreement, Rauch always sought authorization from the Schneiders before making any firm proposal to RBC and always made clear to RBC that any proposed terms required the Schneiders' approval. For example, on January 31, 2001, Ambrecht asked Rauch , "[I]s there any way you can get a firm [offer]?" J.A. 693. Rauch responded, "I'll tell [the Schneiders] to make you an offer." *Id.* On February 12, after consulting with the Schneiders, Rauch responded to Ambrecht with a "firm" offer at fifty-nine percent of face value. J.A. 708. After RBC rejected this price, Rauch told Ambrecht on February 26 he was "85 percent sure" he could "trade the whole piece at 54 [percent of face value]," explaining his uncertainty by noting, "I mean you know, dealing with individuals that are [laughter]." J.A. 711. Later that day, Rauch told Ambrecht that the Schneiders would "probably" agree to a price of fifty-three for the entire block of their notes. J.A. 719. However, Rauch also told Ambrecht that he had recently spoken with Leonard Schneider and it was Schneider's position that at "anything less than [fifty-four Schneider was] gonna hold on to 'em for a while." *Id.*

The negotiations continued in similar fashion into March. On March 12, Ambrecht made an offer at 50.5. Rauch replied, "I'm going to have to reflect back because the last thing I told

5

[the Schneiders] was fifty-one is firm and now I've got to go back and tell them fifty and a half." J.A. 769. When the Schneiders rejected this price, Ambrecht said he would attempt to raise the price to fifty-one, but Rauch told him, "No, at this point, now, they're not going to do anything for a day and a half." J.A. 774. Yet on March 13 Rauch still thought "they'll probably trade them all at fifty-one." J.A. 802. He told Ambrecht, "You know we're not haggling we're done at fifty-one if it gets done and it will probably be tomorrow morning." J.A. 804.

Unbeknownst to Rauch and RBC, however, the Schneiders had received information from McNaughton that significantly altered prospects for payment of the notes, and hence their value. On March 9, McNaughton informed the Schneiders' attorneys that it had received an inquiry from another company about the purchase of McNaughton. The attorneys contacted Schneider the same day, and advised him that "something good was happening with [McNaughton]." Trial Tr. 837. On March 13, the Schneiders met with the attorneys, who "talked about the possibility . . . of a merger or an acquisition of McNaughton . . . and that if that happened, that the notes would . . . be paid 100 cents on the dollar." Trial Tr. 895.

This case turns on the events of the following day, March 14. Rauch and Ambrecht had two recorded phone calls that day. Approximately ten minutes after the second recorded call, RBC called Rauch back, in an effort to "pin[] Mr. Rauch down." Trial Tr. 375. This call, unlike the others, was not recorded, because it was made from the office of Max Holmes, Co-Head of RBC's High-Yield Group, and not from RBC's trading desk. Appellees contend that during the unrecorded call, RBC and Rauch, on behalf of the Schneiders, formed a contract for the sale of the notes at fifty-one. We discuss in detail below the evidence of the content of all three March

6

14 phone calls. As explained below, the trial evidence was insufficient to sustain a finding, by a preponderance of the evidence, that Rauch had received authorization from the Schneiders to make the sale, that RBC could have reasonably believed that Rauch had received authorization from the Schneiders to conclude the trade, or that, under the circumstances, RBC could have reasonably interpreted Rauch's words as expressing agreement to sell the notes at fifty-one.

Rauch learned soon after the unrecorded call that the Schneiders had lost interest in selling the notes. On the night of March 14, the Schneiders' attorney, Jim Alterbaum, left a message for Rauch telling him that Alterbaum was "not sure [the] Schneiders want [Rauch] to proceed with phone calls" to RBC and advising Rauch not to "spin his wheel." Pl.'s Ex. 26. The Schneiders then told Rauch they had decided to put on hold any sale of the notes. On March 20, Rauch told Ambrecht, "nothing is going to happen with the bonds probably for five weeks." J.A. 907.

The Schneiders never sold the notes. On April 16, 2001, Jones Apparel Group announced that it would buy McNaughton. On June 19, the notes were paid in full.

This litigation followed, involving claims by RBC and Highland that, during the unrecorded March 14 call between Rauch and RBC's representatives, the Schneiders contracted to sell their McNaughton notes at fifty-one and that they subsequently breached the contract. The Schneiders denied that Rauch had actual authority to make such a sale, that apparent authority for the transaction was ever communicated to the buyers, or that Rauch ever agreed to sell the notes. After a tortuous pretrial history, which we do not recite because it has no pertinence to the issues on this appeal, the case proceeded to trial. The jury found against the Schneiders and awarded damages for breach of contract totaling approximately $40 million to RBC and Highland. The

district court denied the Schneiders' motion for judgment as a matter of law ("JMOL") or a new trial, and this appeal followed.

**DISCUSSION**

Under Rule 50 of the Federal Rules of Civil Procedure, a district court may grant JMOL against a party if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a). We review a denial of JMOL de novo. *S.E.C. v. DiBella*, 587 F.3d 553, 563 (2d Cir. 2009). In undertaking this review, "we view the evidence in the light most favorable to the party against which the motion was made." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992), *abrogated on other grounds as noted in Young v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005). JMOL is properly granted "only when, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant, a reasonable jury could only have found for the movant." *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir. 1999) (internal quotation marks and alterations omitted).

Appellees' claims rely on a contract between the Schneiders and RBC, which they contend Rauch agreed to on the Schneiders' behalf during the unrecorded phone call of March 14. The evidence would support a finding of such a contract only if it allowed for a reasonable finding that Rauch had actual authority to make the agreement or if RBC relied on his apparent authority to do so. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) ("[A]n agent must have authority, whether apparent, actual or implied, to bind his principal."). We conclude that the record contains insufficient evidence to support either finding, or indeed

8

even a finding that Rauch purported to enter a contract without authorization.

**I.      Actual Authority**

Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly. *Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (N.Y. 1973) ("An agent's power to bind his principal is coextensive with the principal's grant of authority.").[1] As we have explained:

> Actual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.

*Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (internal quotation marks omitted).

To conclude that Rauch had actual authority to enter a contract to sell the notes at fifty-one, a jury would have to find that the Schneiders authorized a sale of the notes at that price or that they had authorized Rauch to exercise discretion as to the terms of the sale. Leonard Schneider and Rauch, of course, expressly denied that the Schneiders authorized the sale of the notes at fifty-one, Trial Tr. 537-38, 837, and nothing in the record supports a finding that the Schneiders gave Rauch such authorization. At the time of the last recorded call on March 14, ten minutes prior to the unrecorded call, they had not done so, and Appellees put forward no evidence that the Schneiders gave Rauch any further authorization in the ten intervening minutes. Indeed,

---

[1] The parties do not dispute that New York law governs the questions of contract and agency law that arise in this appeal.

9

it is virtually inconceivable that they would have done so after learning that McNaughton was likely to be acquired and then to pay the notes at their face amount.

Nor does the record contain evidence that Rauch had actual authority to conclude a contract without obtaining the Schneiders' agreement to the terms. The Letter Agreement unequivocally states that "the consummation of any transaction remains in the sole discretion and satisfaction of" the Schneiders and RBC. All the evidence of the behavior of the parties during the course of the negotiations further confirmed that the Schneiders withheld authorization from Rauch to conclude a contract on their behalf without their consent to the terms. Rauch presented firm offers to RBC only after obtaining the Schneiders' permission to do so, and he presented RBC's offers to the Schneiders before responding to them. There was, therefore, no basis upon which a jury could conclude that Rauch had received actual authorization to enter into a contract without the Schneiders' express agreement to its terms, which he never received.

Appellees' primary argument in support of a finding that Rauch had actual authority to enter into a contract for a sale of the notes at fifty-one is that "customs of business," *Peltz*, 115 F.3d at 1088, imply that Rauch had actual authority to "accept a price on behalf of his clients." Pl.'s Br. at 38. They argue, "[T]here is no evidence that [the Letter Agreement] foreclosed the possibility that Rauch would be communicating the Schneiders' approval of the transaction." *Id.* This may be true, but the crucial question is not whether Rauch could "accept a price" on behalf of the Schneiders, but whether he could do so without their authorization. Likewise, the question is not whether Rauch was authorized to "communicat[e] the Schneiders' approval," but whether he had received the Schneiders' approval. There was no evidence that Rauch had authorization to

10

exercise his own discretion on behalf of his principals as to the terms of the transaction. To the contrary, all the evidence showed that Rauch had no actual authority to contract except upon receipt of the sellers' approval of the terms, and there was no evidence that he had received such approval.

## II.     Apparent Authority

Appellees also contend that Rauch had apparent authority to bind the Schneiders to a contract for the sale of the notes at fifty-one. Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists. "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Peltz,* 115 F.3d at 1088 (internal quotation marks omitted); *see also Wells Fargo Home Mortgage, Inc. v. Hiddekel Church of God, Inc.*, 781 N.Y.S.2d 628, *6 (Sup. Ct. 2004) ("'Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.'" (quoting *Standard Funding Corp. v. Lewitt*, 678 N.E.2d 874, 877 (N.Y. 1997))). However, "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford*, 299 N.E.2d at 664. A party cannot claim that an agent acted with apparent authority when it "knew, or should have known, that [the agent] was exceeding the scope of its authority." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 33 (2d Cir. 2001).

11

To conclude that Rauch had apparent authority to make the contract, a jury would need to find that the Schneiders induced the reasonable belief by RBC that Rauch made the contract having received the authorization of the Schneiders to do so. *See Peltz,* 115 F.3d at 1088. No evidence suggests that the Schneiders did anything to induce RBC to believe that Rauch was authorized to enter an agreement without their specific assent to its terms. The Letter Agreement expressly advised Appellees that he could not, and Rauch repeatedly confirmed this limitation on his authority throughout his negotiations with RBC. For example, on January 31, when Ambrecht asked for a firm offer, Rauch replied, "I'll tell [the Schneiders] to make you an offer." J.A. 693. He responded with a firm offer twelve days later, after consulting with the Schneiders.

Rauch had apparent authority, therefore, to conclude an agreement only if the Schneiders induced RBC to reasonably believe that the Schneiders had agreed to make a deal on the terms offered. We assume arguendo that by authorizing Rauch to negotiate with RBC on their behalf, the Schneiders gave Rauch apparent authority to communicate their assent either expressly or by implication (even if they had not in fact assented). Nevertheless, in light of the evidence of the negotiations preceding the unrecorded March 14 phone call, Appellees failed to introduce sufficient evidence for a reasonable finding, by a preponderance of the evidence, that RBC reasonably believed that Rauch had received authorization from the Schneiders to sell the notes at fifty-one.

The recordings of the first two calls on March 14 make clear that, at the times those calls took place, Rauch lacked authority to sell the notes at fifty-one. In the first call, at 9:40 a.m., Rauch told Ambrecht that he had talked to the Schneiders that morning, but that "they didn't even

12

mention" the deal to sell the notes and he was "not going to know before noon" whether the Schneiders wanted to go forward with the trade. J.A. 821. Rauch explained that he could not conclude an agreement until he spoke with the Schneiders, even though Rauch "would have done the trade yesterday." *Id.* Ambrecht asked whether Rauch thought that the Schneiders had "changed their mind," to which Rauch replied, "No, absolutely not." *Id.* Ambrecht asked why they "just don't say just do it then," to which Rauch responded, "Well, I will let you know as soon as I know . . . ." *Id.*

In the second recorded call, at 2:18 p.m., Rauch continued to make clear that he could not conclude the deal. Ambrecht told Rauch that he was receiving complaints from one of the firms to which RBC planned to sell the notes. He explained that the agent of the other firm had asked him, "[Y]ou got me to step up and now you're not giving me closure here, now what is going on?" J.A. 837. Rauch responded that he "got a call in to the [Schneiders'] attorney and the attorney's supposedly going to call me back." *Id.* Ambrecht asked whether "we need the attorney for a verbal [agreement]" and Rauch insisted that a verbal agreement was not possible at that point because "[the Schneiders] said they wanted to talk to the attorney." *Id.* He explained, "before I say a word, [the attorney's] going to put the words in my mouth." *Id.* Ambrecht asked whether the Schneiders "more or less see if they can like want this, agree to it, it sounds like now?" *Id.* But Rauch responded, "You know, I don't want to go out on a limb because uh I don't know how he's going to tell me, how this goes, you know." *Id.* Ambrecht asked whether Rauch expected to hear from the lawyer soon, to which Rauch replied, "No, no, f[*]cking attorney . . . if he calls me at five thirty, I'll be delighted." J.A. 839. Ambrecht asked whether "it will be okay

13

then to try to do the trade" if the lawyers settled on the wording, but Rauch was noncommittal, saying "Yeah, I mean the, based on the, you know, how he tells me to present it, and you know under what conditions and so forth." J.A. 840. Ambrecht again complained that he was receiving "a lot of pressure" to conclude the deal, and Rauch replied, "Hey, if we agreed to the terms two weeks ago, right now we'd go out for dinner tonight . . . [a]nd say I'm glad that's done." J.A. 841. The call ended with Rauch promising, "I'll call you as soon as I know." J.A. 842.

In light of this undisputed evidence of the content of the recorded calls, none of the evidence of the content of the subsequent unrecorded call supports a reasonable belief on RBC's part that Rauch had received authorization from the Schneiders to make the deal in the intervening minutes. Three people participated in the call on RBC's behalf: Ambrecht, Holmes, and Peter Parent, another Co-Head of the High-Yield Group. Neither Holmes nor Parent had been part of the previous negotiations between RBC and Rauch. Although all the participants in the unrecorded call testified at trial as to the content of the call, Parent's account is the only one that provides even an arguable basis for a finding of apparent authority, and it too is insufficient in light of the other undisputed evidence. Parent testified, "I remember . . . that Glen confirmed size and price with us, 69 million at 51, which means that we had a transaction. . . . Glen was going to get the lawyers to send us a confirm so that we could go to a written form of contract." Tr. 151. However, that the "size and price" under discussion were "69 million at 51" was not in dispute. The issue was whether, under the circumstances, RBC could reasonably understand Rauch to be telling it that the Schneiders had agreed to that price. Parent's addition, "which means that we had a transaction," was a statement about his own thought processes – not Rauch's

14

statements. His belief that they had a contract is insufficient unless the belief was reasonably attributable to Rauch's statements.

Parent's further addition that "Glen was going to get the lawyers to send us a confirm so that we could go to a written form of contract," was ambiguous and in the context also insufficient. *In the absence of other evidence of the communications between RBC and Rauch*, such a statement by a broker in Rauch's position could perhaps reasonably have been understood by RBC as implying that he had received authorization for the contract and that they had a deal. Such ambiguous words, however, could also have represented nothing more than Rauch's expression of his determination to get the deal done. But while either interpretation might be reasonable if the statement were viewed in isolation, the same is not true once the undisputed evidence of the prior negotiations is taken into account. Highland and RBC are entitled to have us consider the evidence in the light most favorable to them in determining whether the jury's verdict in their favor was based on legally sufficient evidence, but we may not disregard undisputed evidence that bears on the interpretation of ambiguous matters. *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-17 (2d Cir. 2007) (evaluating the sufficiency of evidence "in the context of all the evidence"). To prevail on the apparent authority theory, Appellees needed evidence that, taken together with the undisputed evidence of the negotiations, could support a finding that it was more probable than not that RBC reasonably understood Rauch to be saying that he had at last received authorization.

In the context of the other evidence – particularly the undisputed content of the previous recorded calls – a jury could not reasonably find it more probable than not that RBC reasonably

understood the words Parent attributed to Rauch to constitute Rauch's affirmation that he had at last received authorization to make the deal. Only ten minutes earlier, Rauch told RBC that he did not have approval for a sale at fifty-one and that he could not agree to the sale unless he received such approval from either the Schneiders or their lawyers. He said that the Schneiders' attorney would be dictating what he should say and that he did not expect to hear anything before the end of the day. He made clear that he hoped to receive the approval and would call RBC immediately if he did. Rauch, however, did not call RBC. And when RBC called him after the passage of only ten minutes, nothing in their conversation reported by any of the participants suggested that in that intervening ten minutes anything had changed.[2]

Notwithstanding that, upon a different record that contained no other evidence of the known limits of his authority, a broker's statement that he would "get the lawyers to send a confirm" relating to a specified size and price might well be a sufficient basis to support a reasonable belief that the broker had his principal's approval and that the deal was done, we

_____

[2] The testimonies of Holmes, Ambrecht, and Rauch are also insufficient to support a finding of apparent authority. Holmes and Ambrecht did not attribute any words to Rauch that would have led RBC to reasonably believe the Schneiders had authorized Rauch to sell at fifty-one, asserting only their own impressions that a deal had been reached. Indeed, Holmes testified that after the call ended he "shrugged and said, I guess we'll have to wait until tomorrow for Mr. Rauch to call us back." Trial Tr. 401-02. Nor does RBC receive any comfort from Rauch's testimony about the call. He testified that he explicitly told RBC that they did not have a deal:

> Max [Holmes] said, Glen, where are we on the transaction? I said, What do you mean? He said, Do we have size and price? I said, No, we don't have size and we don't have price. He said, Then you mean we're nowhere? I said, Yeah, unfortunately that's where we are. He said, OK, that's it, good-bye. And that was it.

Tr. 539.

cannot disregard the undisputed evidence of the context. In the context of the extensive undisputed evidence of the dealings between Rauch and RBC, that single ambiguous line Parent attributed to Rauch could not sufficiently establish apparent authority. A jury could not reasonably find it more probable than not that RBC reasonably believed, based on that single sentence, that in the ten minutes since the prior recorded call Rauch had finally received the long-awaited authorization to do the $35 million transaction, when Rauch said nothing to suggest that since ten minutes earlier the circumstances had changed. While it is not inconceivable that Rauch's unclear reference to having lawyers send a confirm could have meant that he had received authorization, the complete undisputed circumstances of the call made it so improbable that this was his meaning that RBC could not reasonably draw that inference. A jury could not reasonably conclude, by a preponderance of the evidence, that RBC relied on Rauch's apparent authority to make the deal.

For the same reason, the evidence was insufficient to support a reasonable finding that Rauch expressed agreement to sell the notes during the unrecorded March 14 call or that RBC reasonably construed Rauch's words as expressing agreement to sell at fifty-one. We conclude that, taking all ambiguous or disputed evidence in the light most favorable to the Appellees, but construing it in light of the extensive undisputed evidence, a jury could not reasonably find it more probable than not that Rauch had received authorization to sell at fifty-one, that RBC reasonably believed he had received authorization to sell at fifty-one, or that RBC reasonably understood his words as expressing agreement to sell at fifty-one.

We conclude that the Schneiders were entitled to judgment as a matter of law. We

17

therefore reverse the judgment in favor of Highland and RBC and remand for entry of judgment in favor of the Schneiders.

## CONCLUSION

The district court's order denying Defendants' motion for judgment as a matter of law is hereby REVERSED, and the case is REMANDED with instructions to enter judgment in favor of Defendants.