JOSÉ A. CABRANES, Circuit Judge:
Defendants in this action, an individual corporate officer and an affiliated company, appeal from a judgment entered against them by the United States District Court for the Eastern District of New York (Brian M. Cogan, Judge) following a trial and jury verdict. Defendants were found liable for torture under the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 (“TVPA”), 106 Stat. 73, note following *45 28 U.S.C. § 1350. For the reasons that follow, we reverse the judgment insofar as its rests on the claim brought under the Alien Tort Statute; we affirm the judgment insofar as it rests on the claim under the Torture Victim Protection Act; and we remand the cause to the District Court for such further proceedings as may be appropriate in the circumstances, including any appropriate adjustment for interest.[1]
I. BACKGROUND
A. Factual Background
Plaintiff-appellee Nayeem Mehtab Chowdhury (“Chowdhury” or “plaintiff’), who is the managing director of WorldTel Bangladesh Ltd. (“WorldTel Ltd”) and a stockholder and officer of World Communications Investments Inc. (“WCII”), instituted this suit against his former business associate, defendant-appellant Amjad Hos-sain Khan (“Khan”) and one of Khan’s businesses, Worldtel Bangladesh Holding Ltd. (“WBH”). At all times relevant to this appeal, Chowdhury and Khan were citizens of Bangladesh with legal permanent resident (“LPR”) status in the United States. Prior to the events giving rise to the current dispute, two of their businesses — WBH and WCII — jointly controlled a third entity, World Bangladesh Ltd. (‘WBL”), with both Chowdhury and Khan serving as members on its board of directors. At trial, Chowdhury, who was WBL’s managing director, testified that WBL had a 25-year license to provide a full range of telecommunications services in Bangladesh, with projected five-year profits estimated to be “in excess of a hundred million dollars.” Joint App’x 87.
In 2005, at Chowdhury’s initiative, WBL issued new shares and took out additional debt, with the effect of reducing the interest that WBH (controlled by Khan) had in WBL, from fifty percent to less than one percent. Khan claims that Chowdhury employed improper corporate procedures and forged various signatures, including Khan’s, in order to effect this change. Khan thereafter filed several official complaints against Chowdhury in Bangladesh, petitioning over 17 agencies and divisions of the Bangladeshi government for an official investigation of Chowdhury’s actions.
Khan first complained to the Chief Metropolitan Magistrate in Bangladesh and to the Criminal Investigative Department of the Ministry of Home Affairs, each of which declined to pursue Khan’s complaint after an independent investigation.[2] Khan next sought redress in 2007 with the Directorate General of Forces Intelligence (“DGFI”), an intelligence agency connected to the military. Following this complaint, in the summer of 2007, Chowdhury was summoned before the DGFI — with Khan present — and detained for 53 days, without charges and without access to anyone outside his room of confinement. Chowdhury testified at trial that he was released without any violence against his person during this period of detention by the DGFI.
However, Chowdhury also testified that on November 5, 2007, the Rapid Action Battalion (“RAB”), a paramilitary unit of the Bangladesh National Police to which Khan had also complained, arrested Chow-dhury and held him, without any charges, until November 12, 2007. At trial, Chow-dhury stated that during this second peri *46 od of confinement, from November 5 to 12, 2007, the RAB tortured him, at Khan’s direction, in order to force him to turn over his business interests in Bangladesh to Khan. Chowdhury further stated that, during his confinement by the RAB, he was blindfolded and handcuffed before electric shocks were applied to his thigh and arms through the use of an unidentified prodding device. Chowdhury testified that he was then lifted off his feet and suspended from the prison door by his handcuffs. He also stated in trial testimony that his interrogators told him they were acting at the behest of “Bahdi[, which is] a Bangla word for [Khan].” Joint App’x 137.
Chowdhury testified that he was subsequently transferred out of the RAB’s custody and into the custody of the Dhaka Central Jail for medical treatment stemming from injuries sustained during the RAB’s interrogation. Chowdhury also testified that, after the medical treatment, he was held for a further five months in jail before being released -without any lasting medical symptoms aside from continuing nightmares.
Chowdhury’s parents testified that they, and other family members, met with Khan during Chowdhury’s detention by the RAB. The circumstances of that meeting were disputed at trial. Chowdhury’s parents stated that Khan asked to see them and told them, upon meeting, that: (1) Chowdhury had been subjected to electric shock interrogation; (2) Khan was present for the interrogation; and (3) Khan could make the interrogations stop if Chowdhu-ry agreed to transfer his business interests to Khan and leave Bangladesh entirely. Chowdhury’s parents testified that they refused to agree to these alleged demands. In contrast, Khan testified that Chowdhury’s parents requested the meeting and subsequently asked him to withdraw the charges he had filed with Bangladesh authorities against Chowdhury— which he refused to do. Khan also flatly denied seeing Chowdhury during his detention, having any influence over his treatment in detention, or offering to release Chowdhury if he agreed to transfer his business interests to Khan. There is no dispute that Chowdhury refused to transfer his interest in WBL and remains its managing director.
B. Procedural History
On April 22, 2008, Chowdhury, WorldTel Ltd, and WCII (jointly, “plaintiffs”) filed a complaint against Khan and WBH (jointly, “defendants”), alleging that Khan subjected Chowdhury to torture. On this basis, plaintiffs brought claims under the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991 (“TVPA”), 106 Stat. 73, note following 28 U.S.C. § 1350, seeking monetary damages, punitive damages, and injunctive relief. In pressing these claims, plaintiffs alleged that defendants directly committed violations cognizable under the two statutes, as well as aided and abetted Bangladesh authorities in violations of the same. Defendants moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted. Upon review, the District Court dismissed with prejudice: (1) all claims by the plaintiff corporations; (2) Chowdhury’s aiding and abetting claims under both the ATS and TVPA; and (3) Chowdhury’s TVPA claim against WBH. Chowdhury v. WorldTel Bangladesh Holding, Ltd., 588 F.Supp.2d 375, 388 (E.D.N.Y.2008). The District Court dismissed Chowdhury’s remaining claims — those alleging that his interrogation by the RAB constituted direct violations by Khan of both certain customary international law norms (actionable in federal court under the ATS) and of the *47 TVPA — and granted Chowdhury leave to replead. Id.
On January 5, 2009, Chowdhury, as the sole plaintiff, filed an amended complaint alleging only that the defendants directly[3] engaged in conduct prohibited, or otherwise made actionable, by the ATS and TVPA. Specifically, Chowdhury alleged that Khan caused the RAB to torture him through “electrical shocks and painful shackled standing” and offered to prevent future torture in exchange for control over WBL.
The parties then conducted discovery, which concluded on May 5, 2009. The ease proceeded to trial on August 3, 2009. The jury, on August 4, 2009, returned a general verdict form in favor of Chowdhury in which it concluded that Khan and WBH were liable for torture. It found Khan and WBH liable for $1.5 million in compensatory damages and Khan alone liable for $250,000 in punitive damages. The jury further determined that WBH should not be held liable for punitive damages.
Following the jury’s verdict, defendants brought a motion pursuant to Federal Rules of Civil Procedure 50(b) and 59(a) seeking judgment as a matter of law, or in the alternative, a new trial. The District Court denied the motion, concluding that the evidence at trial “was not only legally sufficient to present the case to the jury, but one sided in plaintiffs favor.” Chowdhury v. Worldtel Bangladesh Holding, Ltd., No. 08 Civ. 1659(BMC), 2009 WL 9058203, at *1 (E.D.N.Y. Sept. 16, 2009). The District Court also noted that the jury could have reasonably determined from testimony not only that Khan had knowledge that Chowdhury was being tortured, but also that the RAB was acting “at the behest of [Khan]” and that Khan attended the torture.[4] Id. Overall, the District Court concluded that under a theory of agency or conspiracy, “[t]he facts set forth ... were more than sufficient to permit the jury to infer that defendant had a deal with the torturers to extract business concessions from [Chowdhury] by doing what they do best.” Id.
In considering the motion, the District Court also rejected multiple evidentiary challenges by defendants. As relevant here, defendants contended that Chowdhu-ry should not have been allowed to testify regarding statements by RAB agents that they were torturing him at Khan’s direction. Id. at *2. In dismissing this challenge, the District Court concluded that the statement was properly admitted as the statement of an agent or co-conspirator because “the jury could reasonably infer that the reason the RAB let [Chowdhu-ry] know why they were torturing him was to induce surrender which would further the aims of the agency and conspiracy.” Id.
The District Court entered judgment in favor of Chowdhury on August 6, 2009, and denied defendants’ motion for judgment as a matter of law on September 16, 2009.
This appeal followed. After oral argument on February 15, 2011, our resolution of the appeal was held in abeyance pending the Supreme Court’s review of another ATS case from this Circuit, Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d *48 Cir.2010). On October 17, 2011, the Supreme Court granted the petition for a writ of certiorari in Kiobel to consider whether the law of nations recognizes corporate liability. See Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 1663, 185 L.Ed.2d 671 (2013) (“Kiobel”). Following oral argument on February 28, 2012, the Supreme Court, on March 5, 2012, restored the case to its calendar for reargument on the additional question of “[w]hether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States.” Kiobel v. Royal Dutch Petroleum, — U.S.-, 132 S.Ct. 1738, 182 L.Ed.2d 270 (2012) (order directing supplemental briefing and reargument). Reargument was held on October 1, 2012, and on April 17, 2013, the Supreme Court affirmed the judgment of the Court of Appeals, but on different grounds, holding that “the presumption against extra-territoriality applies to claims under the ATS,” and that “relief [under the ATS] for violations of the law of nations occurring outside the United States is barred.” 133 S.Ct. at 1669. The Kiobel action having concluded, we directed the parties in the instant appeal to submit supplemental briefing on the impact, if any, of the Supreme Court’s decision in Kiobel. We now address their arguments.
II. DISCUSSION
On appeal, defendants raise four principal arguments: (1) Chowdhury’s ATS claims against both Khan and WBH must be dismissed under the Supreme Court’s holding in Kiobel due to their extra-territorial nature; (2) under the general verdict rule, Chowdhury’s TVPA claim against Khan must also be dismissed; (3) Chow-dhury’s TVPA claim ought to be dismissed because the underlying conduct was extraterritorial and did not constitute actionable torture, and because the claim was predicated on improper agency theories of liability; and (4) Chowdhury’s testimony regarding the RAB’s statements constituted hearsay under Federal Rule of Evidence 801 and was improperly admitted because it was unfairly prejudicial. We consider these arguments in turn.
A. Standards of Review
We review de novo a denial of a motion for judgment as a matter of law. See Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 326 (2d Cir.2010). “In undertaking this review, we view the evidence in the light most favorable to the party against which the motion was made ... [and] draw[ ] all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant_” Id. (citations and internal quotation marks omitted). We review a district court’s denial of a Rule 59 motion for a new trial for abuse of discretion. See United States v. Rigas, 583 F.3d 108, 125 (2d Cir.2009); see also In re Sims, 534 F.3d 117,132 (2d Cir.2008) (explaining that the term of art “abuse of discretion” includes errors of law, clearly erroneous assessments of the evidence, or decisions “that cannot be located within the range of permissible decisions” (internal quotation marks omitted)). We explain the relevant standard of review regarding Kharis challenge to the admission of out-of-court statements in our discussion of that issue.
B. ATS Claims
Defendants first argue that the judgment entered against them pursuant to the ATS must be reversed in light of the Supreme Court’s recent ruling in Kiobel. The unique history and purpose of the ATS has been described at length by the Supreme Court, by the lower courts, and *49 by scholars, and need not be reiterated here.[5] The ATS provides “original jurisdiction” in the federal district courts over “any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. In Sosa v. Alvarez-Ma-chain, 542 U.S. 692, 712, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (“Sosa ”), the Supreme Court recognized that “the ATS is a jurisdictional statute creating no new causes of action,” but that it indicates Congressional intent that “the common law would provide a cause of action for [a] modest number of international law violations” based on a “norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms” familiar to those who enacted the statute. Sosa, 542 U.S. at 724-25, 124 S.Ct. 2739; see also id. at 731 n. 19, 124 S.Ct. 2739 (explaining that the ATS, although a grant of jurisdiction, “carries with it an opportunity to develop common law”).
While this appeal was pending, the Supreme Court in Kiobel further clarified the scope of the ATS by holding that “the presumption against extraterritoriality applies to claims under the ATS,” and concluding that “relief [under the ATS] for violations of the law of nations occurring outside the United States is barred.” 133 S.Ct. at 1669 (citing Morrison v. Nat’l Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2883, 177 L.Ed.2d 535 (2010)). Writing for the Court, the Chief Justice further noted that “all the relevant conduct [in Kiobel ] took place outside the United States,” and therefore the plaintiffs’ “case seeking relief for violations of the law of nations occurring outside the United States is barred.” Id.
Applying the holding of Kiobel to the facts of this case, we conclude that, pursuant to the rule enunciated by the Supreme Court, there is no legally sufficient basis to support the jury’s verdict with respect to plaintiffs claim under the ATS. As described in Part I, ante, “all the relevant conduct” set forth in plaintiffs complaint occurred in Bangladesh, Kiobel, 133 S.Ct. at 1669, and therefore plaintiffs claim brought under the ATS is “barred,”[6] id; see also Balintulo v. Daimler AG, 727 F.3d 174, 189-90 (2d Cir.2013) (“[C]laims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other *50 than the United States.... [I]f all the relevant conduct occurred abroad, that is simply the end of the matter under Kio-bel.”). Accordingly, the judgment must be reversed insofar as it rests on plaintiffs claims under the ATS.
C. TVPA Claim
i. General Verdict Rule
Second, defendants argue that it is impossible to know whether the jury found in favor of plaintiff on the basis of an ATS or TVPA theory of liability. As a consequence, defendants contend, if the ATS claim must be vacated then the judgment must be vacated in its entirety and the cause remanded for a new trial.
The Supreme Court decades ago announced the so-called general verdict rule, that “a new trial will be required” where “there is no way to know that [an] invalid claim.... was not the sole basis for [a] verdict.” United N.Y. & N.J. Sandy Hook Pilots Ass’n v. Halecki; 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 30, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Tire Eng’g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 313 (4th Cir.2012) (“The Supreme Court has recognized that when a jury issues a general verdict on multiple theories of liability and one of those theories is overturned on appeal, the entire verdict falls.”).
Numerous subsequent courts, however, “have engrafted a ... harmless error gloss onto the basic principle.” Muth v. Ford Motor Co., 461 F.3d 557, 564 (5th Cir. 2006). So it is that we have recognized, in this context, that “[hjarmless error arises when we are sufficiently confident that the verdict was not influenced by an error in the jury charge.” Bruneau v. S. Kortright Cent. Sch. Dist., 163 F.3d 749, 759-760 (2d Cir.1998), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009); see also Tire Eng’g & Distribution, 682 F.3d at 314; Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 30 (1st Cir. 2004) (“[W]e have generously applied the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support.”).
Applying a harmless error analysis to the facts of the instant case, we have no difficulty in concluding, as we discuss below, that there was indeed adequate evi-dentiary support for a jury to find the defendants liable for torture under the TVPA. Under the straightforward circumstances of this case, plaintiffs claim brought under the ATS and his claim under the TVPA both stemmed from the same alleged acts of torture, and Khan can point to no circumstances in which the jury could have found him liable under the ATS but not the TVPA.
ii. Other Challenges to the TVPA Claim: Extraterritoriality, Torture, and Agency

a. Extraterritoriality

Defendant Khan also raises other challenges to the validity of judgment entered against him under plaintiffs TVPA claim. All of his arguments lack merit.
First, Khan asserts that the conduct underlying the TVPA claim here ,“do[es] not ‘touch and concern’ the United States,” Appellant’s Supp. Letter Br. 4 (quoting Kiobel, 133 S.Ct. at 1669), and we must therefore exercise a “ ‘vigilant door keeping’ function,” id. (quoting Sosa, 542 U.S. at 732-33, 124 S.Ct. 2739), to bar it. We find no support in Kiobel or any other authority for the proposition that the territorial constraints on common-law causes of *51 action under the ATS apply to the statutory cause of action created by the TVPA. Rather, we must conduct a separate statutory analysis with respect to the TVPA to determine whether that statute — not the ATS — “ ‘gives ... clear indication of an extraterritorial application.’” Kiobel, 133 S.Ct. at 1664 (quoting Morrison, 130 S.Ct. at 2878). Under this separate analysis, we conclude that the TVPA, unlike the ATS, has extraterritorial application.
Our analysis begins with the text of the statute. Congress created civil liability in the TVPA, inter alia, for torture and extrajudicial killing carried out by an individual with “actual or apparent authority, or color of law, of any foreign nation” TVPA § 2(a) (emphasis supplied). Although this language could conceivably refer to conduct occurring within the United States, the provision is more naturally understood to address primarily conduct occurring in the territory of foreign sovereigns.[7] The legislative history of the TVPA unambiguously supports that conclusion. See S.Rep. No. 102-249, p. 3-4 (1991) (“A state that practices torture and summary execution is not one that adheres to the rule of law. Consequently, the Torture Victim Protection Act (TVPA) is designed to respond to this situation by providing a civil cause of action in U.S. courts for torture committed abroad.”); H.R.Rep. No. 102-367, pt. 1, p. 4 (1991), 1992 U.S.C.C.A.N. 84 (noting Judge Bork’s skepticism in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984), as to whether “victims of torture committed in foreign nations” could bring a cause of action under the ATS absent an explicit grant of a cause of action and stating that the “TVPA would provide such a grant”). Thus, we find no bar on the basis of extraterritoriality to Chowdhury’s TVPA claim.[8]

b. Torture

Second, Khan argues that the facts presented do not constitute torture under the TVPA, because not all police brutality is actionable under the statute. It is clearly true, of course, that not all conduct falling under the journalistic and political rubric of “police brutality,” whether here or abroad, can be described as “torture,” but a review of the particular facts of this ease persuades us that the jury could have properly found the conduct presented to constitute torture under the TVPA. The TVPA defines torture as
any act, directed against an individual in the offender’s custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is *52 suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.
TVPA § 3(b)(1). While “torture [under this definition] does not automatically result whenever individuals in official custody are subjected even to direct physical assault,” Price v. Socialist People’s Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C.Cir.2002), we conclude that the term “torture” can apply to powerful electric shocks administered to the body, when the fact-finder determines that the shocks are sufficiently severe. This conclusion is bolstered by the numerous courts of appeals that have referred to electric shocks as an instrument of torture. See, e.g., Jean-Pierre v. U.S. Attorney General, 500 F.3d 1315,1324 n. 6 (11th Cir.2007) (noting that electric shock can constitute torture within the meaning of the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (“CAT”), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, the multilateral international convention upon which the TVPA was based); see also Cherichel v. Holder, 591 F.3d 1002, 1009, n.ll (8th Cir.2010) (electric shock may rise to the level of torture); Abdel-Rahman v. Gonzales, 493 F.3d 444, 448 (4th Cir.2007) (same); Lhanzom v. Gonzales, 430 F.3d 833, 848 (7th Cir.2005) (same); United States v. Webster, 392 F.3d 787, 794 (5th Cir.2004) (same); Price, 294 F.3d at 92-93; Zubeda v. Ashcroft, 333 F.3d 463, 472 (3d Cir.2003) (same).
Additionally, the TVPA contemplates the “purposes” for which torture might be undertaken by the perpetrator, and specifically lists “intimidating or coercing” the victim among them. TVPA § 3(b)(1). Here, defendants subjected Chowdhury to electric shocks for the distinct purpose of coercing him to relinquish his business interests to Khan.
In this case, moreover, the District Court took particular care to instruct the jury on the definition of torture in a manner consistent with the one provided by the TVPA, stating that “[t]he severity requirement is crucial in determining whether conduct is torture” and that “an act must be a deliberate and calculated act of an extremely cruel and inhuman nature specifically intended to inflict excruciating and agonizing physical or mental pain or suffering” in order to constitute torture.[9] Joint App’x 213. Accordingly, we find that plaintiffs allegations of being subject to electric shock while detained by the RAB were properly actionable as torture under the TVPA.
c. Agency
Third, Khan claims that the jury’s verdict was predicated on improper agency theories of liability, arguing that any brutality by RAB agents was not attributable to him. We disagree. The weight of authority makes clear that agency theories of liability are available in the context of a TVPA claim.
For a claim of torture to be actionable under the TVPA, a plaintiff must demonstrate, inter alia, that a defendant acted “under actual or apparent authority, or color of law, of any foreign nation.” TVPA § 2(a). To determine whether a defendant acted under color of foreign law, we look to “principles of agency law and to jurisprudence under 42 U.S.C. § 1983.” Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir.1995). Under those principles, “[f]or purposes of the TVPA, an individual acts under color of law ... when *53 he acts together with state officials or with significant state aid.” Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 260 (2d Cir.2007) (per curiam) (internal quotation marks omitted), aff'd for want of a quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza, 553 U.S. 1028, 128 S.Ct. 2424, 171 L.Ed.2d 225 (2008); Kadic, 70 F.3d at 245 (same); cf. Arar, 585 F.3d at 567-568 (“[T]o state a claim under the TVPA, [plaintiff] must adequately allege that the defendants possessed power under [foreign] law, and that the offending actions ... derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power.”). Khan, who was found to have conspired with state authorities in Bangladesh, thus clearly acted under color of law within the meaning of the TVPA.
Agency law, however, does not simply apply to the question whether a defendant acts under color of law; it also can provide a theory of tort liability if a defendant did not personally torture the victim. As the Supreme Court recently explained in Mohamad v. Palestinian Authority, -U.S.-, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012), “Congress is understood to legislate against a background of common-law adjudicatory principles,” id. at 1709 (quotation marks omitted), and therefore “the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing,” id. (citing Chavez v. Carranza, 559 F.3d 486 (6th Cir.2009)).
Congress has not, in other words, “specified” any “intent” that traditional agency principles should not apply under the TVPA. Meyer v. Holley, 537 U.S. 280, 287, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003); see also S.Rep. No. 102-249, at 9 (1991) (noting that “responsibility for torture ... extends beyond the person or persons who actually committed those acts”); Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir.2005) (holding that “the [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act”). Accordingly, an individual can be liable for “subjecting]” the victim to torture even if his agent administers the torture,[10] see TVPA § 2(a)(1), and the District Court did not err in permitting agency theories of liability to be submitted to the jury.[11]
*54 D. Admission of Out-of-Court Statements
Finally, Khan argues that the District Court erred in allowing Chowdhu-ry to testify about statements made by RAB agents while he was in their custody. The District Court admitted these statements as statements of an agent or cocon-spirator pursuant to Federal Rule of Evidence 801(d)(2).[12] We review a district court’s evidentiary rulings for “abuse of discretion.” United States v. Al Kassar, 660 F.3d 108, 123 (2d Cir.2011); In re Sims, 534 F.3d 117, 132 (2d Cir.2008). Whether certain evidence is hearsay is generally a question of law that is reviewed de novo, see United States v. Ferguson, 676 F.3d 260, 285 (2d Cir.2011), but the admission of evidence under Rule 801(d)(2) is generally based on a district court’s assessment of whether the evidence is sufficient to trigger one of the Rule’s five exceptions, and therefore we generally review for “clear error” a district court’s decision, pursuant to Rule 801(d)(2), to admit evidence that would otherwise constitute hearsay, see id. at 285 & 285 n. 27; United States v. Coppola, 671 F.3d 220, 246 (2d Cir.2012). Having reviewed the record in light of this standard, we find no error, much less clear error, in the District Court’s admission of the testimony. Accordingly, we reject defendants’ evidentia-ry challenge substantially for the reasons set forth in the District Court’s ruling of August 4, 2009, and in our prior discussion of the sufficiency of the evidence with respect to agency liability, see Part II(C)(ii)(c), ante.
CONCLUSION
We have reviewed all of Khan’s arguments on appeal and summarize our holdings as follows:
(1) The conduct giving rise to this action occurred within the territory of another sovereign and, therefore, pursuant to the Supreme Court’s recent decision in Kiobel v. Royal Dutch
Petroleum Co., — U.S. -, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), cannot form the basis for an action brought under the Aien Tort Statute, 28 U.S.C. § 1350.
(2) The general verdict rule does not require that the judgment against defendant be vacated with respect to plaintiffs claim under the Torture Victim Protection Act, 106 Stat. 73, note following 28 U.S.C. § 1350, because, on the facts of this ease, the jury necessarily found defendant Khan liable under that statute in returning a general verdict in favor of plaintiff.
(3) Plaintiffs claim under the Torture Victim Protection Act was based on actionable torture, and permissibly *55 predicated on agency theories of liability.
(4) The District Court did not err in allowing plaintiff to testify at trial regarding certain statements made to him by foreign police agents, who were agents or coconspirators of the defendant.
For the reasons stated above, we REVERSE the judgment of the District Court insofar as its rests on claims brought under the Alien Tort Statute, and we AFFIRM the judgment insofar as it rests on a claim brought under the Torture Victim Protection Act. We REMAND the cause to the District Court for such further proceedings as may be appropriate in the circumstances, including any appropriate adjustment for interest.

. As a general matter, "[¡Interest shall be allowed on any money judgment in a civil case recovered in a district court ... calculated from the date of the entry of the judgment....” 28 U.S.C. § 1961(a).

. Khan testified that he personally met with Bangladesh’s Secretary of Home Affairs and complained to anybody he could think of in the government about Chowdhury’s conduct.

. Chowdhury did not re-file two claims alleging that defendants had aided and abetted violations under the TVPA and ATS.

. The District Court noted, for instance, that evidence of an email sent from Khan to one of Chowdhury’s associates, after the latter’s arrest by the RAB, was ''particular[ly] damning,” and that Khan's explanation of the message while testifying before the jury "was somewhat shocking.” Chowdhury, 2009 WL 9053203, at *1.

. See, e.g., Kiobel, 133 S.Ct. at 1663; Sosa v. Alvarez-Machain, 542 U.S. 692, 712, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); Kiobel, 621 F.3d at 115; Filartiga v. Pena-Irala, 630 F.2d 876, 887 (2d Cir.1980); IIT v. Vencap, Ltd., 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.) ("This old but little used section is a kind of legal Lohengrin ... no one seems to know whence it came.”), abrogated on other grounds by Morrison v. Nat’l Austl. Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010); Anthony J. Bellia Jr. & Bradford R. Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445 (2011); Curtis A. Bradley, The Alien Tort Statute and Article III, 42 Va J. Int’ll. 587 (2002).

. Plaintiff’s claims under the ATS against WBH encounter a second obstacle as well: the Supreme Court’s decision in Kiobel did not disturb the precedent of this Circuit, see Kiobel, 621 F.3d at 145, off d on other grounds by 133 S.Ct. at 1669, that corporate liability is not presently recognized under customary international law and thus is not currently actionable under the ATS. See Baraket v. Holder, 632 F.3d 56, 59 (2d Cir.2011) (" 'A decision of a panel of this Court is binding unless and until it is overruled by the Court en banc or by the Supreme Court.’ ”) (quoting S & R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 83 (2d Cir.1998)). We also note that Chowdhury’s amended complaint did not state a TVPA claim against WBH. See Moha-mad v. Palestinian Authority, - U.S. -, 132 S.Ct. 1702, 1710, 182 L.Ed.2d 720 (2012) (holding that "Congress did not extend liability to organizations” under the TVPA).

. Justice Kennedy — one of the five Justices who joined the Kiobel majority opinion — explicitly endorsed the extraterritorial reach of the TVPA in his concurring opinion in Kiobel, noting that the TVPA addresses "human rights abuses committed abroad.” Kiobel, 133 S.Ct. at 1669 (Kennedy, J., concurring) (emphasis added).

. Although the parties do not raise the issue, we note that our affirmance of plaintiff's TVPA claim here necessarily recognizes that aliens — not just American citizens — may bring suit under the TVPA, a conclusion that we have relied upon, but not made explicit, in prior decisions. See Arar v. Ashcroft, 532 F.3d 157, 176 n. 13 (2d Cir.2008) (observing "that past holdings of our Court, as well as those of our sister courts of appeals, strongly suggest that TVPA actions may in fact be brought by non-U.S. citizens,” and collecting authorities), vacated and superseded, on other grounds, on rehearing en banc, 585 F.3d 559, 568 (2d Cir.2009).

. Indeed, the District Court further instructed the jury, properly, that not all physical assaults, instances of police brutality, or excessive force rise to the level of torture.

. The District Court dismissed the aiding- and-abetting claim against Khan, and therefore we need not address whether the TVPA recognizes that theory of liability — an "ancient criminal law doctrine" that is generally presumed not to apply in civil suits. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 181-82, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 118, 123 (2d Cir.2013).

. Khan raises a number of claims regarding the specific agency theories upon which the District Court instructed the jury, all of which lack merit. First, Khan claims that "there was no evidence of an agreement” between him and members of the RAB. Appellants' Br. 15. Having conducted a review of the record, we identify no support for this argument, and therefore reject it. Second, Khan argues that a ratification theory of agency can be used "only with respect to a parent corporation's liability for a subsidiary’s acts.” Appellants' Br.18. We perceive no basis in tort law or agency law for Khan’s argument, see, e.g., Restatement (Third) of Agency § 7.04 (outlining the bases for liability on a ratification theory of agency), and further determine that the ratification theory of agency was amply supported by the record evidence in this case. Finally, Khan raises a perplexing claim that the District Court's instruction on willful participation liability was “essentially the same as [an instruction] on aiding and abetting,” and since the District Court had already dismissed the aiding and abetting claims, it should not have instructed the jury on willful participation. Appellants' Br. 21. Whether someone is a "willful participant in joint action with the State or its agents," however, is the standard for determining whether a pri *54 vate actor acts under color of law, see Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), and is plainly not, as Khan asserts, merely an alternative instruction on an aiding-and-abetting theory. Accordingly, we conclude that Khan’s claims regarding the agency theories upon which the District Court instructed the jury all lack merit.

. Rule 801(d)(2) provides that a statement is not hearsay if it is offered against "an opposing party” and it:
(A) was made by the party in an individual or representative capacity;
(B) is one the party manifested that it adopted or believed to be true;
(C) was made by a person whom the party authorized to make a statement on the subject;
(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
(E) was made by the party’s coconspirator during and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2).